141 N.J. Super. 177 (1976)
357 A.2d 772
HARRY BONNET ET AL., PLAINTIFFS,
v.
STATE OF NEW JERSEY, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided February 11, 1976.
*189 Mr. William L. Brach for plaintiffs (Messrs. Brach, Eichler, Rosenberg & Silver, attorneys; Mr. William H. Eaton on trial briefs).
Mr. Richard M. Conley, Deputy Attorney General, for defendants (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
Mr. David G. Lubell of the New York Bar, for intervenor League of Women Voters of New Jersey (Mr. William J. Bender, attorney).
DWYER, J.S.C.
After the publication of the trial court's opinion in Robinson v. Cahill, 118 N.J. Super. 223 (Law Div. 1972)[1] and before the decision of the New Jersey Supreme Court in Robinson v. Cahill, 62 N.J. 473 (1973),[2] the complaint in this action was filed.
The action is brought on behalf of seven separate classes of plaintiffs.
The essence of the complaint is that the present system of distributing fiscal burdens whereby the 21 counties are required to pay for the residual costs of operation of

*190 1. The County, County District and Juvenile and Domestic Relations Courts, as well as certain costs of the Law Division, Superior Court (count I);
2. The office of the prosecutor (count II);
3. The jury commissioners, including costs for grand and petit juries (count II);
4. The probation departments (count II), and
5. 12 1/2% of the benefits paid under the federally assisted categorical welfare programs, plus the cost of administration thereof not paid by the Federal Government (count III),
denies to each of the seven classes of plaintiffs equal protection of the law and due process of law as guaranteed by the Fourteenth Amendment and the State Constitution.
Plaintiffs are separated into classes as follows: (1) all persons residing in Essex County (residents); (2) all persons paying real estate taxes in Essex County (taxpayers); (3) Essex County (county); (4) the 22 municipalities located within the county (municipalities); (5) all blacks residing within the county (Blacks) (count IV); (6) all low-income families residing within the county, who are defined as those receiving an income less than 125% of the poverty level income (the poor) (count V);[3] and (7) all owners of real estate designed or intended to produce an income and which has been, or is about to be, foreclosed for nonpayment of real estate taxes (count VI).
The claims of residents, taxpayers, county and municipalities are based on the first three counts. Counts IV, V and VI contain allegations incorporating counts I to III plus an allegation that because the cost burdens are unduly concentrated in the county which has the greatest concentration of these respective groups, there is "invidious" discrimination as to such groups.[4]
*191 Count VII and count VIII relate to all classes and basically allege that since the taxes to defray such costs were being raised for state purposes under N.J. Const. (1947), Art. VIII, ง I, par. 1 they had to be levied on a uniform basis throughout the State. Count IX alleges that all statutes in question are tax statutes which had originated in the Senate, instead of the Assembly, contrary to N.J. Const. (1947), Art. IV, ง VI, par. 1.
The relief sought is an injunction against the collection of real estate taxes for the payment of these costs, even though the injunction would necessarily run against the county and municipalities.
The named defendants are: the State of New Jersey (State), the Governor and other heads of departments in the Executive Branch, the President of the Senate and the Speaker of the Assembly in the Legislative Branch, and the Administrative Director of the Courts in the Judicial Branch. The court will refer to them collectively as defendants.
The Administrative Director of the Courts filed a statement in lieu of answer in which he stated he would abide by the final judgment entered by the courts. The Attorney General filed an answer on behalf of all other defendants, admitting references to statutes and the Federal and State Constitutions but denying that a cause of action was stated.
Defendants moved to dismiss. The motion was denied. The Appellate Division affirmed, Bonnett v. State, 126 N.J. Super. 239 (1974),[5] and remanded for trial, noting that in Robinson v. Cahill, supra, 62 N.J. at 500-501, the New Jersey Supreme Court had not foreclosed the possibility *192 that there could be a cause of action under either the concept of equal protection of the law or under the concept of an implicit premise of local government that the State could not use local governments as a means to unfairly distribute its fiscal responsibilities.
It reminded plaintiffs that they had the burden of proof, citing Ring v. North Arlington, 136 N.J.L. 494, 498 (Sup. Ct. 1948), aff'd 1 N.J. 24 (1948). In terms of the rights asserted under the Fourteenth Amendment, plaintiffs also have the burden of proof as to federally protected rights. McGowan v. Maryland, 366 U.S. 420, 535, 81 S.Ct. 1101, 1194, 6 L.Ed.2d 393, 461 (1961).
A pretrial conference was held. Plaintiffs did not amend the complaint but added an issue that the present system of distributing the cost burdens for the above-mentioned services violated the implicit premise of local government. The State preserved its contentions that some of the plaintiffs had no standing to bring the action. The case was then assigned to this court for trial. The trial has been held and an extensive record developed, particularly in terms of stipulated exhibits.
Certain issues may be determined immediately. No evidence was submitted in support of count IX and it was dismissed at the conclusion of the trial without objection. In respect to the foreclosed, the class embraced in count VI, no representative appeared at trial and no evidence was introduced as to any specific piece of real property owned by any individual. Neither the pleadings nor the testimony of Dr. Sternlieb about economic effects of the tax rate on values of property identify with precision that class of owners of real property. Dr. Sternlieb is identified and his testimony is examined at section IV-B, infra.
At the trial the tax collector for the City of Newark testified about Newark's extensive holdings of income-producing real estate as a result of foreclosure of tax liens. However, the need for extensive rehabilitation of many of the structures due to age is also obvious from such testimony. *193 One structure required over $100,000 of masonry work to prevent its stone work from falling onto persons and vehicles using a major intersection. The testimony also indicates that a host of factors contributed to the conditions of the buildings that he testified about, other than the tax burdens imposed by the present system. The court finds that this testimony did not fill the void in the proof left by the representatives of the foreclosed. The court dismisses count VI for lack of proof.
Counts VII and VIII are premised upon what is now N.J. Const. (1947), Art. VIII, ง I, par. 1(a), which provides:
Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein, and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.
The essence of count VII is found in paragraph 6 of that count which states:
* * * The Constitutional authorization is limited to distribution of state raised revenues and does not provide authorization or power to the State through the legislature to utilize local property taxes or to allocate costs through the counties to the municipalities as a means of supporting State services, functions and facilities, or discharging obligations and responsibilities of the state. * * *
The essence of count VIII is that under the aforesaid Article, taxes levied by a county or a municipality can only be levied and assessed locally "for the use of such taxing district * * *" and that the statutes in question compel the levying and assessing of taxes for state purposes.
In respect to this provision of the State Constitution, in Robinson v. Cahill, supra, the Supreme Court said:
* * * the tax clause was not intended to say that a State function may not be delegated to local government to be met by local taxation. *194 As we noted in Point I, local government is simply an arm of the State with respect to the many State functions which the State decides shall be performed through local government. The tax clause does not restrict the State with respect to that decision. Rather it means that if the State decides to handle a service at State level and to do so on the basis of a property tax, it must tax all taxable property in the State rather than only property in a part of the State; and that if the responsibility for the State function is assigned to local government, the local tax must fall uniformly upon all taxable property within the county or the municipality as the case may be. [62 N.J. at 502-503]
The Supreme Court also held that the Article guaranteeing a thorough and efficient education to school children was not intended to, and did not, guarantee statewide equality to taxpayers in respect to taxes to pay for education.
Neither in the briefs submitted nor in argument after trial did counsel for plaintiffs state how the interpretation of the tax clause by the Supreme Court in Robinson v. Cahill, quoted above, is inapplicable in this case. There is no express provision in the State Constitution comparable to that found in constitutions of other states which bar a state from imposing costs for certain state functions on local units of government. See Colbert v. Bond, 110 Tenn. 370, 75 S.W. 1061 (Sup. Ct. 1903); but see, Davidson Cty. v. Kirkpatrick, 150 Tenn. 546, 266 S.W. 107 (Sup. Ct. 1924).
Plaintiffs have not shown that any provision of the State Constitution, other than the Articles already referred to, results by implication in a limitation upon the State's power to require a local unit of government to perform a function and to bear the costs of doing so.
In State v. County Court of Malheur County, 185 Or. 392, 203 P.2d 305 (Sup. Ct. 1949), the state sued for, and obtained, a writ of mandamus to compel county officials to include in the county budget the estimated cost of the county paying for its local share of benefits and costs of administration of federally assisted categorical welfare programs. Among the defenses raised was that the state was imposing a state tax and therefore under the Oregon Constitution the tax had to be on a uniform basis throughout the *195 state. After the Oregon Supreme Court noted that a county is not an independent government, but is a quasi corporation created by legislative flat for governmental purposes, and the legislature, subject to constitutional limitations, may compel a county to raise taxes for a specific purpose, it concluded that county failed "to distinguish between a legislative mandate requiring counties to levy a tax and the act of a county in making a levy pursuant to the mandate." 185 Or. at 411, 203 P.2d at 314. It concluded that the tax was a county, and not a state, tax; hence there was no violation of the Oregon constitutional provision requiring the tax to be uniform throughout the state.
For the foregoing reasons, counts VII and VIII are dismissed.
It is appropriate to note at the outset that some of the commentators on Robinson v. Cahill, supra, have suggested that the present action may be one where the existing structure of state and local governments may be changed. See Tractenberg, Reforming School Finance Through State Constitutions: Robinson v. Cahill Points the Way, 27 Rutgers L. Rev. 365, 460-463 (1974); some authors on public finance referred to in the exhibits submitted pursuant to stipulation of the parties have suggested that programs for redistribution of income, such as the federally assisted categorical welfare programs, are inappropriate for financing by local real estate taxes and local governments, see Netzer, "Federal, State, and Local Finance In a Metropolitan Context," in Perloff and Wingo, Issues in Urban Economics, (1968); Heilbrun, "Organizing and Financing the Metropolitan Public Sector," Urban Economics and Public Policy, c. 12 (1974), and that for over 40 years various committees appointed by the Legislature and/or the Governor have recommended that the State assume all the costs at issue.[6]
*196 The chambers of the court are in Newark. The problems of Newark to which witnesses testified are obvious to the eye as one looks out the window. They cannot be ignored as one travels the streets. They can be poignant when they emerge from the background in the cases that are tried in the courtrooms in Newark. However, in a democratic society choices between alternative policies are to be made by elected representatives in the Legislature, subject to the restraints imposed on the Legislature by the Federal and State Constitutions to protect the rights of individuals or groups. It is the function of the court to protect the rights of individuals and groups within the constitutional framework and to apply and develop the law, but not to substitute the court's judgment as to what is better policy. A court is not a super legislature. See Justice Stone's dissenting opinion in Colgate v. Harvey, 296 U.S. 404, 436, 56 S.Ct. 252, 262, 80 L.Ed. 299, 314 (1935).
Neither the complaint nor the pretrial order contains any allegation that any individual has been denied access to, or service from, any institution or agency, the costs of which are the subject matter of this suit, or that the level of service of such institutions or agencies is inadequate. No proof was offered that there was such a denial or inadequacy. In the absence of such a claim and proof thereof this case differs from that presented in Robinson v. Cahill, supra where Robinson established he was denied the thorough and efficient education guaranteed him by State Constitution.
The issue presented here is the unfairness of the present system in distributing the burden of payment. The first question for resolution is which individuals or groups have a right that the Legislature may have violated, i.e., who has standing. The second question is what is the appropriate *197 standard for judicial review of the Legislature's action in respect to the rights of those who do have standing. The third question is what does the evidence show. The balance of this opinion is organized in that order. The legal arguments will be presented with the specific issues as they are considered.

I
Although courts should not resort to legal niceties to dismiss cases for procedural reasons on questions of standing rather than reaching the merits of the case, see Vanderwart v. Civil Service Dept., 19 N.J. 341, 347 (1955); Bergen Cty. v. Port of N.Y. Authority, 32 N.J. 303, 316 (1960) (dissenting opinion), the determination of standing questions avoids trials, particularly on public questions, that may not result in a determination of any question.
Cases involving the question of standing arise most frequently in the federal courts because their jurisdiction is limited to "cases and controversies" by the language of U.S. Const., Art. III, ง 2. See 59 Am. Jur.2d, Parties, งง 26-27 at 374-379.
In Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), Justice Powell, writing for the majority, said:
* * * In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise. E.g., Barrows v. Jackson, 346 U.S. 249, 255-256, 73 S.Ct. 1031, 1034-1035, 97 L.Ed. 1586 (1953). In both dimensions it is founded in concern about the proper โ and properly limited โ role of the courts in a democratic society. [Citations omitted]
In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a `case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has `alleged *198 such a personal stake in the outcome of the controversy' to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).[9] The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.
[9] See H. Hart & H. Wechsler, The Federal Courts and the Federal System 156 (2d ed. 1973).
After he stated that there are other limitations such as that plaintiff must not have a "generalized grievance" but must assert that his, her or its own interests are violated, and not base his, her or its claims on the rights of third parties, Justice Powell said:
* * * Without such limitations โ closely related to Art. III concerns but essentially matters of judicial self-governance โ the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights. See, e.g. Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, at 222, 94 S.Ct., 2925, at 2932, 41 L.Ed.2d 706.
The limitations of "case and controversy," as found in Art. III of the Federal Constitution, do not apply to state courts. If a state court passes upon a federal question and there is no standing, the United States Supreme Court may dismiss an appeal from a state court based on an asserted right guaranteed by the Federal Constitution on the ground appellant lacks standing to raise the question, with the result that the action of the state court results in no meaningful determination to the parties or the public. See Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). Since plaintiffs are asserting rights under both the Constitutions of the United States and the State, standing should be considered.
In denying the standing of a temporary foster mother to challenge the statute requiring immunization of school age *199 children before admission to school on grounds it deprived her of guarantees of religious freedom because her religion forbade immunization, the Appellate Division, after pointing out that the religion of the children was different, said in Mountain Lakes Bd. of Ed. v. Maas, 56 N.J. Super. 245 (App. Div. 1959), aff'd per curiam, 31 N.J. 537, cert. den. 363 U.S. 843, 80 S.Ct. 1613, 4 L.Ed.2d 1727 (1960):
Basically, the constitutionality of a statute, ordinance or regulation is open to attack only by a person whose rights are adversely affected. The burden of proof is upon the individual who claims himself harmed to show how, as to him, the statute is unconstitutional. Jones v. Opelika, 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691, 141 A.L.R. 514 (1942). No one can obtain a decision as to the invalidity of a law on the ground that it impairs the rights of others; such a one `is not the champion of any rights except his own.' 11 Am. Jur., Constitutional Law, ง 111, pp. 752-753 (1937) * * *.
Insofar as defendant seeks to assert her own right to religious freedom, she has no standing. [56 N.J. Super. at 259]
Many New Jersey cases recognize the requirement that a party, whether an individual or a class, must show an injury distinct from injury to public in general in order to maintain a suit. See Sprissler v. Pennsylvania-Reading S.S. Lines, 45 N.J. 127, 137 (1965); State v. Smith, 102 N.J. Super. 325, 335 (Law Div. 1968). In Koons v. Atlantic City, 134 N.J.L. 329 (Sup. Ct. 1946), aff'd per curiam, 135 N.J.L. 204 (E. & A. 1947), the court held plaintiff who was a resident of, but not an owner of real property in, Atlantic City had standing to challenge the constitutionality of a sales tax limited to Atlantic City for she would have to pay it. The court stated:
* * * The question is fundamentally one of interest; and it would be a distinct disservice of principle and policy to hold that a resident of a municipality who pays real or personal property taxes has an interest which invests him with power to assail an invalid sales tax by certiorari, but that a resident subject only to the sales tax has no such interest. It is a rule of general acceptance that the constitutionality of a legislative act is open to attack only by a person whose rights would be infringed by its enforcement. * * * [134 N.J.L. at 338]
*200 In the complaint Harry Bonnet is described as a resident and person owning real property in the county on which he pays taxes. Evidence at the trial establishes these facts. The complaint then separates residents and taxpayers into two classes.
Residents are defined as the 929,984 persons residing in the county, according to the 1970 census. Careful review of the 39-page complaint does not reveal any allegation that residents suffer special injury distinct from other members of the general public.
The residents urge that if the county did not have to spend that portion of the money it now receives from real estate taxes to defray the costs in question, the board of freeholders might then engage in other activities. The implementation of such desires, or hopes, may well require the Legislature to authorize such activity, and the court's decision in this matter would not independently authorize such activity. Similar statements were made by a witness for Newark. On the other hand, it is equally possible that the board of freeholders and the Newark City Council might vote not to spend money, but to keep real estate taxes down. The latter course of action is urged by Dr. Sternlieb, who testified for plaintiffs.
Residents differ from the residents in Southern Burlington Cty. N.A.A.C.P. v. Township of Mt. Laurel Tp., 119 N.J. Super. 164 (Law Div. 1972), aff'd 67 N.J. 151 (1975). In that case plaintiff residents showed that they occupied, or had occupied, substandard housing in defendant township and could not obtain standard sanitary housing in defendant township. The trial judge held that the residents had standing to attack the zoning ordinance which had the practical effect of excluding from the township housing under federally subsidized programs which said plaintiff residents could afford. In essence, they showed a direct personal injury not suffered by members of the general public. In the case at bar residents have made no such showing. *201 The court concludes that the residents have no standing; therefore, the action is dismissed as to them.
Harry Bonnet is an owner of real estate subject to tax in one of the municipalities and as such is compelled to pay real estate taxes to defray the residual costs which are the subject of this suit. Bonnet's testimony regarding his real estate taxes utilized equalized values which were actually higher than his assessed value. Computations were made based on equalized values to establish that Bonnet had paid taxes in 1973 aggregating $386.01 for county purposes. Based on the evidence in this case the amount of his tax attributable to state-mandated costs, and thus at issue here, was $133.95 on an equalized basis.
When a property owner is asked to pay his or her fair share to defray the lawfully incurred expenses of the community, that is taxation. If an individual is asked to pay more and, upon failure to do so, the property may be sold to satisfy the charge, that is confiscation. It is the taking of private property for public use without compensation. Agens v. Newark, 37 N.J.L. 415 (E. & A. 1874); Baldwin v. Fuller, 39 N.J.L. 576 (Sup. Ct. 1877), aff'd 40 N.J.L. 615 (E. & A. 1878); Vail's Ex'rs v. Runyon, 41 N.J.L. 98 (Sup. Ct. 1879).
In constitutional terms, the imposition of unfair tax burdens, to the point where they are discriminatory, with the power to sell the taxed property to collect payment, violates N.J. Const. (1947), Art. 1, par. 20, which provides:
Private property shall not be taken for public use without just compensation. Individuals or private corporations shall not be authorized to take private property for public use without just compensation first made to the owners.
Also in constitutional terms, the imposition of taxes unequally upon persons similarly situated is a denial of the equal protection of the law guaranteed by the State Constitution and Fourteenth Amendment. See Washington National Ins. Co. v. Board of Review, 1 N.J. 545 (1949); *202 Hillsborough Tp. v. Cromwell, 326 U.S. 620, 623, 66 S.Ct. 445, 448, 90 L.Ed. 358, 363 (1946).
In addition to listing Harry Bonnet and the other named individuals who own real property subject to tax in the county, the complaint describes the class as consisting of all who pay taxes on real estate in the county. The court concludes that the taxpayers have standing as a class, for they are subject to paying any excess burden based upon the alleged violations of constitutional guarantees.
To the extent that any concept of local government implies that the State is limited in distributing its fiscal burdens equitably, this class, which must pay any excess burden, has standing to raise that question. What other persons may, or may not, have standing to raise the latter question will have to await decision in the future. The court concludes taxpayers have standing.
The county was created by the State for purpose of administering governmental functions. In Bergen Cty. v. Port of N.Y. Authority, 32 N.J. 303 (1960), the Supreme Court said:
* * * Historically the county was solely a subdivision of the State constituted to administer state power and authority. It differed from a municipality in that, whereas a municipality was created upon the request or with the consent of the inhabitants to act both as a body politic on behalf of the State and also as a representative of the inhabitants for their local convenience in its so called corporate or proprietary capacity, the county on the other hand was created by the State without regard to local wishes and solely to serve as a body politic. [Citations omitted] * * * [T]oday a county is assigned functions which in strictness may be deemed to be corporate and hence historically the subject of grant to municipalities. Indeed our statute constitutes the county a body both politic and corporate. R.S. 40:18-1, N.J.S.A. Nonetheless, the county's powers are only those granted to it, and the municipality remains the repository of the broad police power over local affairs. The role of the county is still relatively more restricted. * * * [at 312-313]
See State v. County Court of Malheur County, supra. See also 1 McQuillin, Municipal Corporations (rev. vol. 1971), งง 1.24, 1.25 and 2.46(a).
*203 The county alleges that discriminatory burdens resulting from the State not paying the costs for the services which the county must provide from state revenues, or from a uniform statewide real property tax, result in ever-spiraling tax rates which the county must pass on to municipalities, and they, in turn, to their taxpayers, with consequent loss of essential services which the county and said municipalities should provide. There was no proof at trial that any of the statutes in question have prevented the county from rendering any essential service which it is authorized to provide. The county's interest in the case is in its governmental capacity only.
The municipalities are required to levy taxes adequate to pay to the county determined amounts, N.J.S.A. 54:4-74, and are further required to pay that amount to the county, whether or not the municipalities collect it, N.J.S.A. 54:4-76. If a municipality collects 100% of the levy, then in respect to taxes for the county it is acting as a conduit in its capacity as governmental agent.
The United States Supreme Court has held that counties and municipalities have no rights in their governmental capacities under the Fourteenth Amendment as against the state which created them. See Williams v. Mayor and City Council of Baltimore, 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923); Newark v. New Jersey, 262 U.S. 192, 43 S.Ct. 539, 67 L.Ed. 943 (1923). In Williams v. Mayor and City Council of Baltimore, supra, Justice Cardozo said:
A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator. [289 U.S. at 40, 53 S.Ct. at 432, 77 L.Ed. at 1020]
See City of New York v. Richardson, 473 F.2d 923 (2d Cir.) (compelling local governmental units to pay money *204 which otherwise would be available to defray costs for functions reserved to states under Tenth Amendment was not unconstitutional, and remanding to a three-judge district court the question of denial of equal protection), cert. den. 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973); on remand, Lindsay v. Wyman, 372 F. Supp. 1360 (S.D. N.Y.), aff'd sub nom. Beame v. Lavine, 419 U.S. 806, 95 S.Ct. 21, 42 L.Ed.2d 35 (1974) (denying standing of City of New York to challenge burden of paying local share of welfare costs when states provided counties should make payments of remainder to state, but recognizing standing of taxpayers to raise issue under Equal Protection Clause).
Plaintiffs cite East Orange v. Palmer, 47 N.J. 307 (1966); Jersey City v. Zink, 133 N.J.L. 437 (E. & A. 1945), cert. den. 326 U.S. 797, 66 S.Ct. 493, 90 L.Ed. 485 (1946), and Morristown Bd. of Ed. v. Palmer, 88 N.J. Super. 378 (App. Div. 1965), as holding that a municipality may sue the State and its appropriate officers where the State is taking a municipality's property, or acting in an arbitrary or capricious manner which is forbidden by the concept of the equal protection of the law. Those cases do hold a municipality may bring such a suit, but they are not applicable here.
In the first two cases cited above the municipalities sued to collect taxes which had been levied upon private property, included in local budgets as required by laws of the State, and which taxes the State by its action, or threatened action, would have taken from said municipalities. Such taxes are property of the municipalities in which they have an interest in protecting, in the same sense as the cash in their bank accounts, and which no other person could protect. In the third case the municipality sued to have the State condemn a school which, the municipality alleged, the construction of an interstate highway for all practical purposes would destroy โ i.e., the State was taking its property without just compensation.
*205 In the case before this court the county and municipalities seek to have the court order a redistribution of the burdens of governmental operations, and not the enforcement of property rights previously established or acquired. The former require resolution of choices of policy which are initially the consideration of the Legislature. The latter do not.
At trial, Steven Rother, the Newark Tax Collector, (Rother) testified as to the status of real estate in Newark and the operations of Newark in the real estate field. There are 47,000 separate line items, reflecting a like number of lots or parcels, on Newark's tax books. 60% of the tax parcels are tax exempt. He also testified that 60% of the ratable base in terms of value is tax exempt as well. He explained that the relationship in the percentages is coincidental, and not causal. In substance, there are 18,800 parcels potentially subject to real estate tax in Newark.
At the time he testified in late 1974 Newark had acquired tax sale certificates on 3,000 parcels. He further testified that there were liens on an additional 2,000 parcels which Newark would put up for sale within 30 days.
Under N.J.S.A. 54:5-104.34 Newark could not convert the tax sale certificates into an absolute title until two years had elapsed in order to permit the owner to redeem.[7] During that period of time the parcels are carried on the tax rolls and form a basis for allocating to Newark taxes payable to the county.
When Newark acquires title to the parcels they are removed from the tax rolls, unless Newark rents the property. In the latter event the parcels are kept on the tax rolls for purposes of payment of taxes to the county. Rother testified this was due to rulings of the Essex County Board of Taxation.
In 1967 the public bought 45 out of 834 certificates. The public now buys only four or five such certificates a year. *206 Newark is required to bid in over 1,000 such certificates a year. In earlier years the public actively bid for tax certificates and Newark owned little potentially taxable real estate. At homestead auctions Newark sells dwelling units for up to four families to persons who will undertake to rehabilitate them. There have been some purchases.
Newark has title to 26% of the taxable real estate in Newark. It currently manages 300 to 400 residential properties which Newark has acquired for nonpayment of back taxes, exclusive of the ones run by the Newark Housing Authority, and exclusive of units for four families or less. Newark manages a number of commercial buildings, including the Military Park Building, the Griffith Building, and the Broad and Market Building. It also manages numerous others. Newark has title to the Essex House as well as the Industrial Building alongside it, and the Hotel Douglas. They are empty and completely vandalized inside.
Under these conditions Newark is actively engaged in the real estate market, however unwillingly. Although its action in such a market stems from its governmental role, and is necessitated by it, Newark is looking to the rents from, and not taxes on, such properties paid by others to meet its share of the taxes payable to the county. On the evidence in this record this court holds that Newark has standing under such circumstances to maintain this action, for it is in practical effect suffering the same type of injury as other taxpayers and no one else can object in respect to taxes paid to the county on these properties. See Koons v. Atlantic, supra.
Since there is no definition, or clarification, of what circumstances may result in a finding that the delegation by the State of its fiscal responsibility to local governments has resulted in such inequality that the concept of local government is violated, this court holds that on the facts in this record Newark at least has standing to raise the question because its interest is the same as other taxpayers.
*207 Neither the county nor any other municipality has made a showing similar to that of Newark. As stated earlier, the county is in a different position from the municipalities and, in many respects, does not have the broad responsibilities of a local government such as a municipality.
There was no evidence at the trial that any municipality, other than Newark, has not been able to function as a local government as contemplated by the statutes, i.e., having an ability to resell parcels acquired through tax foreclosure within a reasonable period of time.
On the grounds that the county and the municipalities, other than Newark, appear only in their governmental capacities, the court concludes that they have no standing and dismisses the action as to them.
There remains for consideration the class representing the blacks and the poor.
The fourth count sets forth the claims for the blacks. The allegations therein are summarized herein. Blacks constitute 11% of the State's population: 36.3% of all blacks live in the county and constitute about 30% of the county's population of 929,984. Since World War II many blacks have migrated to industrial centers in the northern United States. Because of a variety of factors and state policies in zoning and job hiring, blacks have had to concentrate in areas such as the county. It is asserted that, by using a geographic basis for distributing the tax burden of defraying the costs for the state services in question, the State has employed a classification that imposes a disproportionate burden of such costs on blacks by concentrating the burden in areas where blacks live. Invidious discrimination against blacks in the county is the alleged result.
The fifth count sets forth the claims on behalf of the poor. The allegations in that count are summarized herein. Based on the 1970 Census, 11.27% of the residents of the State have incomes that are below 125% of the federally defined standard for poverty; 21% of such persons live in the county. Dense concentrations of poor persons is a nationally *208 recognized factor in increasing the need for law enforcement, courts, welfare and other governmental services. State policies in zoning, planning and other areas have led to such concentration of low-income families in the county and a few other counties. It is asserted that by using a geographic basis for distributing the tax burden for defraying the costs of the state services in question, the State has employed a classification that imposes a disproportionate burden of such costs on the poor. This results in invidious discrimination.
From these allegations the blacks and the poor have pleaded a denial of the equal protection of the laws. Bonnett v. State, supra. The determination of whether the proof establishes that the present system results in such a denial must await examination of the evidence.
In summary, the classes that the court finds have standing are the taxpayers, blacks and poor.

II
The traditional standard for judicial review of legislative action in the fields of taxation and economic regulation which is used to determine whether the concept of equal protection of the law has been violated may be summarized as follows:
1. The concept of equal protection of the law allows the State power to classify and allows it a wide scope of discretion in making classifications. The action of the State in making classifications is presumptively valid. Such action of the State is set aside only when there is no reasonable basis to support the action and such action is therefore arbitrary.
2. The State having made a classification that is grounded upon some reasonable basis, the classification does not violate the concept of equal protection because not made with mathematical certainty or it results in some inequality.
3. When the classification is called into question, if any set of facts can be reasonably conceived that will sustain the *209 classification, the existence of that set of facts at the time the law was enacted must be assumed. The same principle should apply to subsequent amendments to the law.
See McGowan v. Maryland, supra; Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911); Washington National Ins. Co. v. Board of Review, 1 N.J. 545 (1949); Ring v. North Arlington, supra, 136 N.J.L. at 497-498.
This is the standard that the United States Supreme Court applied in San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), in respect to the problem of financing public school education. The same standard was applied in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), where the Supreme Court held that the limit of $250 a month on a maximum grant under Maryland's AFDC program did not violate the concept of equal protection of the law so as to deprive children of large families because they received less per child than children of smaller families.
Where there is an allegation of discrimination based on color or some other invidious basis, and a prima facie showing of discrimination on such basis is made, the United States Supreme Court has applied the "close scrutiny" test to determine if rights protected by the Federal Constitution, or law, have been violated; i.e., it has required that the particular state show there is some compelling reason under valid state policy to justify the existence of the discrimination. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Police Dept. of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); "Developments in the Law, Equal Protection," 82 Harv. L. Rev. 1065 (1969).
*210 The decision of the United States Supreme Court in San Antonio Indep. School Dist. v. Rodriguez, supra, was handed down before the New Jersey Supreme Court announced its decision in Robinson v. Cahill, supra; hence, the latter did not have to apply the "close scrutiny" test because there was neither any allegation of invidious discrimination in that case nor any other problem under rights based on federal questions to apply it to in light of the aforesaid decision. However, Chief Justice Weintraub, writing for a unanimous court, said that the New Jersey Supreme Court had rejected that test for determining whether rights had been violated within the concept of equal protection of the law embodied in State Constitution.
* * * [W]e note briefly the reason why we are not prepared to accept that concept for State constitutional purposes. We have no difficulty with the thought that a discrimination which may have an invidious base is "suspect" and will be examined closely. And if a discrimination of that kind is found, the inquiry may well end, for it is not likely that a State interest could sustain such a discrimination. But we have not found helpful the concept of a "fundamental" right. No one has successfully defined the term for this purpose. Even the proposition discussed in Rodriguez, that a right is "fundamental" if it is explicitly or implicitly guaranteed in the Constitution, is immediately vulnerable, for the right to acquire and hold property is guaranteed in the Federal and State Constitutions, and surely that right is not a likely candidate for such preferred treatment. And if a right is somehow found to be "fundamental," there remains the question as to what State interest is "compelling" and there, too, we find little, if any, light. Mechanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. Ultimately a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial. [62 N.J. at 491-492]
Since there are allegations in the pleadings which set forth a claim that there is invidious discrimination in violation of federally protected rights, the court will first consider *211 from the evidence whether plaintiffs have established a case of invidious discrimination, for the resolution of that question will determine the type of analysis which is to be applied in deciding whether plaintiffs have been denied equal protection of their rights.
The allegation that the State has violated the implicit premise of local government is examined after the determination of whether there is a violation of the concept of equal protection of the law, for if the latter has been violated, there is no need to consider the former.

III

(A) Plaintiffs' claim of invidious discrimination as to blacks and poor.
The claims asserted are not on behalf of all blacks and poor in the state but only those in the county. If these classes are paying a disproportionately high burden as a result of state action, then even in the absence of intentional state action, Hawkins v. Town of Shaw, 437 F.2d 1286 (5 Cir.1971), they have established a prima facie case and the close scrutiny test must be applied as to their rights under federal law. In that case the Court of Appeals for the Fifth Circuit reversed the District Court's dismissal of the action after trial, based upon the findings of the District Court which it made employing the standard of review of a "rational basis for State action" that produced differences between classifications of persons.
In respect to intent, the Court of Appeals said:
In a civil rights suit alleging racial discrimination in contravention of the Fourteenth Amendment, actual intent or motive need not be directly proved, for:
`"equal protection of the laws" means more than merely the absence of governmental action designed to discriminate; * * * we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.' Norwalk *212 CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2d Cir., 1968) * * *. [at 1291-1292]
In respect to statistics, the opinion reveals that they reflected physical conditions in the town, i.e., the number of paved and unpaved streets, location of sanitary and storm sewers in terms of homes occupied by blacks and whites, number of street lights of various types, etc., and percentages developed therefrom.
The Court of Appeals stated:
* * * [The town's] population, which has undergone little change since 1930, consists of about 2,500 people โ 1,500 black and 1,000 white residents. Residential racial segregation is almost total. There are 451 dwelling units occupied by blacks in town, and, of these, 97% (439) are located in neighborhoods in which no whites reside. That the town's policies in administering various municipal services have led to substantially less attention being paid to the black portion of town is clear.
Nearly 98% of all homes that front on unpaved streets in Shaw are occupied by blacks. Ninety-seven percent of the homes not served by sanitary sewers are in black neighborhoods. Further, while the town has acquired a significant number of medium and high intensity mercury vapor street lighting fixtures, every one of them has been installed in white neighborhoods. The record further discloses that similar statistical evidence of grave disparities in both the level and kind of services * * * was also brought forth and not disputed. * * *
Surely, this was enough evidence to establish a prima facie case of racial discrimination. * * * [437 F.2d at 1288]
Judge Bell, in a concurring opinion, stated that the Town of Shaw had paid for all the improvements and services from annual general taxes levied on real estate, had a cash surplus in each year, and had no bonded indebtedness.
In this case, as in Hawkins v. Town of Shaw, supra, plaintiffs are relying primarily upon statistical data. This data was utilized in several computations for the purpose of isolating and comparing different variable factors and relationships. Plaintiffs' position is that significant patterns are thereby revealed which indicate the existence of invidious discrimination.
No representative of either the blacks or poor testified.
*213 By means of stipulated evidence the underlying costs reflected in the budgets for the functions at issue were established for each of the 21 counties.[8] Plaintiffs then established the number of blacks and poor in the respective counties from the 1970 census.
Plaintiffs relied upon Dr. Purcell Benson, who holds a doctorate in Sociological Statistics and has served as Director of the Business Research Center of Rutgers University to explain and verify their statistical data.
The court has summarized a number of underlying exhibits in Tables I, II and III and presented those facts around which the witnesses concentrated their testimony, i.e., the unfortunate seven and the favored three counties. Full tables are in the Appendix.

 TABLE I
 COSTS PER $1,000 EQUALIZED VALUATION
 JUDICIARY โ ADMINISTRATION[*]Actual Budgeted
Seven Highest Counties 1973 1974
 Essex $1.76 $ 2.07
 Hudson 1.48 1.66
 Cumberland 1.11 1.34 (5)[**]
 Camden 1.09 1.41 (3)
 Passaic 1.02 1.40 (4)
 Mercer .98 1.00 (9)
 Atlantic 1.20 (6)
Three Lowest Counties
 Hunterdon .35 .47
 Sussex .38 .59 (17)
 Cape May .40 .52
 Bergen .52
Total for all counties .86 1.00
Total state equalized valuation adjusted to $1,000 basis

*214
 TABLE II
 COSTS PER $1,000 EQUALIZED VALUATION
 WELFARE COSTS[***]Actual Budgeted
Seven Highest Counties 1973 1974
 Essex $2.86 $2.97
 Camden 2.38 2.44
 Cumberland 2.16 2.20
 Hudson 1.90 2.05
 Atlantic 1.89 2.01
 Salem 1.46 1.39
 Monmouth 1.19 1.28
Three Lowest Counties
 Morris .17 .20 (2)[**]
 Bergen .18 .19 (1)
 Somerset .29 .40 (4)
 Hunterdon .31 .34 (3)
Total for all counties 1.02 1.11
 TABLE III
 POPULATION CHARACTERISTICS BY COUNTY[****]Black Residents Poor Residents
 as Percent of as Percent of
Seven Highest County County
 Counties Population Population Population
Essex 30.00 13.1 929,984
Atlantic 17.33 13.0 175,043
*215 Mercer 16.43 9.3 (8)[*****] 303,968
Salem 15.30 11.9 (5) 60,343
Cumberland 13.64 11.8 (6) 121,374
Camden 11.34 8.9 (10) 456,291
Union 11.19 6.1 (17) 543,116
Cape May 7.89 (13)[*****] 12.4 (3) 59,554
Hudson 10.07 (9) 11.9 (4) 609,261
Passaic 18.45 (8) 9.3 (7) 460,782
Five Lowest Counties
Bergen 2.78 (17) 4.1 (20) 898,012
Morris 2.19 (18) 3.8 (21) 383,454
Hunterdon 1.75 (19) 6.3 (15) 69,718
Warren less than 1.00 (20) 7.0 (13) 73,879
Sussex less than .50 (21) 6.8 (14) 77,528
Somerset 3.57 (15) 4.3 (19) 198,372

The court has summarized in Table IV a number of exhibits prepared by others with the assistance of a computer under the direction of Benson. Benson testified that the variable of the costs for the various functions in terms of a $1,000 of equalized valuation of tax ratables per county was plotted against the variable of percent poor, percent black, and population density to see if there was any correlation between the variables.[9] Did the cost of courts increase as the variable for the poor increased, as the variable for the blacks increased, or as the variable for population increased?
If one variable increases as another does, there is a positive correlation. If each increase of one is matched by a proportionate increase in the other, there is a perfect positive correlation. If one plotted these factors on a simple X-Y graph, the left axis (X) listing the cost data and the right axis (Y) listing the quantities for the other variables, and then placed a dot on the graph where lines drawn from each axis for each unit of measure intersected, one would obtain *216 a plot. If the correlation is perfect, a line drawn through these dots would be a straight line. Such a correlation is expressed mathematically as +1. If one variable decreases in proportion to another, a line drawn through such dots would still be a straight line but would slope down to the left. Such a correlation is expressed mathematically as -1.
The plot of the dots of intersection from the data for two independent variables is referred to as a scatter diagram. The pattern of such a diagram for +.5 and +.9 correlations is shown in figures 1 and 2. The court thanks Benson for the use of the illustrative charts.

*217 
Benson's testimony from the record and indicated by the exhibits is that statistically the correlations set forth in Table IV are probably not the result of chance. The State did not present any testimony that disputed this and the court accepts it.
The correlations Benson found are set forth below in Table IV.

*218
 TABLE IV[*]
 CORRELATIONS โ COST PER $1,000 EQUALIZED VALUATION TO:
 Percent Concentration Percent Concentration
Category Poor Black
of Cost 1970 1973 1974 1970 1973 1974
Total - courts .461 .445 .484 .403 .575 .648
Prosecutor's
 office .746 .415 .547 .903 .690 .723
Jury Commission
 and fees .189 .491 .409 .210 .553 .462
Probation
 Department -.141 .584 .564 .034 .851 .772
Welfare .731 .763 .749 .766 .819 .820
 Population
Category Density Multiple Regression on
of Cost 1970 1973 1974 1970 1973 1974
Total - courts .895 .653 .716 .936 .753 .854
Prosecutor's
 office .357 .725 .529 .912 .872 .782
Jury Commission
 and fees -.087 .362 .374 .269 .596 .527
Probation
 Department .021 .509 .434 .245 .850 .793
Welfare .197 .400 .415 .809 .863 .860

*219 Benson explained that multiple regression is a statistical method to check which of several variables contributes most to a correlation. Using this technique, a computer program was written to determine which of the three variables contributed the most to the correlations. Population was the variable most frequently rejected.
Benson testified that on the scale -1 to +1, "0" indicated no correlation and said:
On that scale, a value of .50 represents you're half way up the scale towards 1.0 and would to me indicate the convincing evidence that there is serious involvement of poor people or black people or those who live in the high population ghetto areas of cities in these [sic] tax difficulties as far as paying the burden of county expenses is concerned.
In looking at lower correlations they still tell us something four or even point five, they are, however, less over-powering in calling one's attention as a statistician to the existence of some tax discrepancy.
He also explained that the revisions in the budget manual issued for counties by the Division of Local Finance in 1973 and 1974 improved the reporting process for all counties in those years, so that relevant data for all counties was available for those years. In 1970 the budgets for some counties did not sufficiently identify cost items, so that information for not more than 19 or 20 counties was available for some categories in 1970. Thus the 1970 calculations are not as reliable as those for 1973 and 1974.
Benson also testified that strong correlation mathematically does not establish that there is a causal connection between the action of any two variables.
Mr. James A. Arnold, Jr., holds a B.S. in Business Administration and a Master's Degree in Economics, and has taught statistics at the college and university level. He testified for the State as an expert in statistics. He has an extensive background in research, particularly in the area of tax policy in New Jersey and as a consultant on tax policy matters in some 25 states. Arnold has served as Chief *220 of Tax Research and Statistics in the Division of Taxation in the State's Treasury Department for the past 16 years and served as the consultant to the State Tax Policy Commission from its formation in 1945 until joining the State's Treasury Department sometime around 1954.
He stated that in his opinion, since the data was based on only 21 observations, correlations which are not fairly high, such as.9, should not command much attention. He said that if one had only two observations, there would have to be a perfect correlation, because one could draw a straight line through them. In his opinion, it would be difficult to draw a straight line through a scatter diagram of points for a correlation of .48. He also expressed the opinion that the multiple regression factors added very little because there is a tendency for statistics relating to blacks and the poor to overlap; hence, they measure the same factor twice.
On cross-examination he conceded that the poor and blacks, when examined in terms of Table III, were not identical; e.g., Sussex, Warren and Hunterdon have small percentages of blacks but significant percentages of poor; hence they do not always measure the same factors.
He also questioned using state equalized valuations as a base for comparison to show unequal tax burdens. This approach did not take into account a myriad of other factors, such as cost differences between counties. In his opinion, one should look at what percentage of the respective county budgets are being spent for the different services and, if there are significant differences, what causes them. Neither the State, nor plaintiffs, offered such an analysis.
He also said that one should expect to find a high correlation of costs for welfare to assessed valuation in those areas where there are a large number of poor. Based on his earlier observation about statistical data showing the overlap between the blacks and poor, he said that a high correlation between areas with concentration of blacks and such costs was also to be expected.
*221 Evaluating the testimony about the correlations, the court finds that there is not such a showing of correlation between costs for courts and juries and concentrations of blacks and the poor as to invite suspicion. Using Benson's criteria of +.5 as a guide, population appears to be a far more important factor. If one disregards the year 1970, population appears to have about the same degree of correlation to cost, if not more, than blacks.
In respect to the Probation Department, there are correlations for 1973 and 1974 that suggest a much higher correlation between cost and blacks than poor or population. This may be due in part to the efforts of county welfare boards to collect support payments for families under the AFDC programs. Director Lazaro of the County's Welfare Board testified that there was a staff of 16 attorneys bringing such cases in the county. To the extent that there is a high correlation between costs for probation and concentrations of blacks, this may be attributable to welfare problems.
Accepting Arnold's criteria of .9, the correlations between welfare costs and concentration of blacks and the poor are statistically significant, and not unexpectedly high. As Arnold testified, one expects local costs for welfare to be highest where the poor are concentrated.
The question then arises as to whether the present system unfairly concentrates the cost burden on these two classes in an invidious manner.
The testimony at trial was given in terms of the aggregate of the mandated costs for 1973, except in the case of Benson's exhibits. Director of Freeholders Cook testified that the aggregate of mandated costs for the county was $34,726,316 and the net mandated costs to the county were $32,912,066 for all costs at issue. The aggregate for all counties in the State was $128,781,000.
Rother testified that Newark paid about 24.53% of the taxes paid to the county; hence, Newark pays 24.53% of the net mandated costs, or $8,518,365.
*222 According to the underlying data from which Benson's exhibits were prepared, the aggregate of the welfare costs for the county in 1973 was $21,890,982, and $79,072,781 for all counties.
Lazaro testified that about 80% of the county's welfare cases come from Newark.
If Newark pays 24.53% of the county costs, then Newark pays $5,369,857 of the county's welfare costs. If Newark paid 80% of such costs, the amount would be $17,512,785. Although one cannot assume a constant cost per case, the reasonable inference is that under the present system there is a shift of a major portion of the welfare burden from Newark, where blacks and poor are concentrated, to other municipalities in the county where there are fewer members of these classes. The same principle applies to the balance of the mandated costs, except that the shift between cost and benefit received between residents of Newark and other areas of the county is probably not as great. There are no statistics in the record that state who receives the benefits of other programs.
The 1970 census data, which is the basis for the population data in this action, shows that 207,302 blacks reside in Newark. This is 74.3% of the 36% of blacks of the State who live in the county.
In Newark there are approximately 12,800 units of public housing for low income families under the Newark Housing Authority, of which 3,000 units are used for senior citizens. Such real property is exempt from taxation, N.J.S.A. 55:14A-20, although the Newark Housing Authority does make payments to Newark in small amounts for services and facilities provided by Newark, N.J.S.A. 55:14A-27. There are a number of other statutes under which the taxation of low income housing is limited. N.J.S.A. 55:16-18 (limited dividend) and (nonprofit); N.J.S.A. 55:14I-5 (senior citizen). There are approximately 1,000 of such units in existence. Other units are under construction pursuant to these laws and are in various stages of completion.
*223 In respect to moderate income housing, provision is made for payment of 20% of gross shelter rent as payment in lieu of taxes, with power granted to county boards of taxation to include in the tables of equalized values an "assumed assessed value of the property represented by the amount of payments in lieu of property taxes to any municipality pursuant to this act." N.J.S.A. 55:14J-30.
The court has not been able to establish with any precision from the record or exhibits the number of poor or low-income families in Newark as against the rest of the county or area. The census data covering this information consolidates Newark with other areas. See Bureau of Census, General Social Economic Characteristics, New Jersey (1970), Table 90. Using Table III herein, there are 121,827 persons in the county in families that have an income at or below 125% of poverty level. Based on Table 90, id., there are 116,096 in Newark and approximately 78,000 in the rest of the area, but the area includes parts of Union County where Table 90 shows 18,059 such persons in Elizabeth. The court finds that a substantial majority of the poor are concentrated in Newark. The court further finds that there is a substantial overlap of identity between the blacks and poor. The poor undoubtedly qualify and occupy the housing which enjoys special benefits under the real property tax laws. To the extent that members of these classes occupy such housing and are exempt from taxation, there is obviously no invidious discrimination as to them.
But if the matter is examined without regard to the benefit of exemption from the alleged burdens, what is the result โ that is, if it is assumed that all members of these two classes who live in Newark live in fully taxable residential real estate?
Arnold testified about a special study he did to see how the real estate tax was borne between business real property and residential properties. It is part of the record. The annual report for the Division of Taxation includes a table showing net taxes paid by each class of real property in each *224 municipality. The last column shows the percentage of tax paid by residential property. For purposes of classification within the Division of Taxation, apartment houses with five or more units are listed as commercial. The special study combined all residential property and apartments together so that the properties subject to real estate tax housing people were combined.
The county tax for each county was then applied for the new class for each municipality and county. The study was not refined to the mandated costs because of the amount of work entailed.
Statewide, the county tax on residential property was $.52 and $.71 on apartments. On the combination of the two it was $.54. The averages for the county were $1.05, $1.38 and $1.09, respectively. All municipalities in the county, except Cedar Grove and Fairfield, had higher effective county tax rates than Newark on residential properties. All municipalities in the county, except Belleville, Bloomfield and West Caldwell had lower effective tax rates on apartments than Newark.
In Newark residential properties pay 27.31% of the real property taxes. When combined with apartments, the two classes of property pay 39% of the real property taxes. The balance, 61%, is paid by industrial, commercial, business, tangible personal property and vacant land. There are several communities where the residential properties pay over 90% of the real estate taxes.
Arnold identified a study of sales prices to assessment values for residential and business real property in which the properties had been placed in various value classes. The purpose of the study was to get basic data to see how a classified property tax system would work. It included all 567 municipalities in New Jersey.
Statewide the average sales/assessment ratio for all residential property was 66.40% and all business property 79.48%. For the county the average is 65.57% for residential *225 and 85.21% for business. For Newark the average is 53.52% for residential and 92.56% for business.
He explained that the stated, or tax bill, rate for Newark is double and effective rate for residential property. In Newark the sales price to assessment value is $53.52% for residential property, so that if put on true value, the assessment would double. The tax bill rate for business about equals the effective rate because the sales to assessment ratio is 92.56%.
To the extent revaluation is implemented in Newark, Arnold said there would be a shift of tax burden to those paying taxes on residential properties. But the fact is, there is a present condition of underassessment.
Stated in terms of who is paying the mandated costs, individuals owning or paying rent to owners of residential properties in Newark are paying 39% of the burden and business is paying 61%. If Newark is paying 24.53% of county taxes and residential properties pay 39% of all taxes, then individuals living in taxable real estate in Newark are paying $3,322,162 of these costs.[10]
Tables I and II show that the county had a cost of $1.76 and $2.07 for judiciary-administration costs, and $2.86 and $2.97 for welfare costs per $1,000 of equalized valuation for 1973 and 1974, respectively. From the same sources the averages for the State were $.86 and $1.00 for judiciary-administration costs and $1.02 and $1.11 for welfare costs.
Using the equalized value for all residential property for Newark; i.e., residences plus apartments as the base ($825,791,048 as of October 1, 1973), and the $3,322,162 of the mandated costs paid by Newark residential property as the numerator, the result is $.000402 per $1, or *226 $.402 per $1,000 of equalized residential property for all mandated costs under the present system. On a similar basis the county figures are $4.62 for 1973 and $5.04 for 1974, and the state averages are $1.88 for 1973 and $2.11 for 1974. Assuming that those Newark residents who are members of the classes that the present system is alleged to invidiously discriminate against are in fact living in the residential property paying that share of the mandated costs, the members of these classes are paying at a rate one-tenth of that paid by others in the county and one fourth of that paid on the average by others in the State. This indicates that they enjoy a more favored position and not one where they are discriminated against.
Based on Dr. Sternliebs' testimony, discussed in IV(b) infra, that the high tax rate in Newark compels the owner of real property to sell at a discount, those who are members of the class and occupy residential properties purchased after the discount became effective, passed the impact of the higher burden on to the seller of the real property at the time of purchase. Although no testimony was directed to this specific topic, there was testimony that many members of the classes embracing blacks and also the poor arrived in Newark in the period between 1955 and 1966. This is corroborated by data in the 1970 census. This data at least suggests that some members of these classes who own residential property did purchase in that period, or later, when sellers had to discount their properties in Newark in order to sell, and therefore such members are not bearing as much of the burden as are other taxpayers.
Based on the foregoing the court finds that the present system does not concentrate the burden of the mandated costs for the functions at issue in an invidious manner upon the members of the classes consisting of blacks and the poor in the county.
Evaluation of the record indicates that there is no basis for a finding that the Legislature has enacted laws in the *227 past for the purpose of unduly inflicting burdens on the alleged classes concentrated in Newark.
There was no evidence produced at trial, or argument urged either orally or in brief, that apart from the concentration of the cost burdens on the areas where the blacks and poor live they were denied the equal protection of the law. Even if reassessment is implemented, since assessments are presently about 50%, the increase of the burden of the mandated costs on residential properties in Newark would rise from $3,000,000 to $6,000,000.[11] This change would not substantially alter the burden upon blacks and the poor because of the shift of the welfare costs to other municipalities. Welfare costs are approximately two-thirds of the net mandated costs.
The court dismisses counts IV and V on the grounds that the evidence does not establish that present system invidiously discriminates against the classes covered thereby.

(B) Taxpayers claim that present system is not founded upon a reasonable basis related to state policy.
Plaintiffs urge that in respect to the mandated costs for judiciary-administration, the functions are mandated by either the State Constitution or statutes. The persons administering these courts, offices and agencies are appointed by the State. In many respects the expenditure levels are set by the Legislature, since the Legislature specifies the salaries and other factors. The county has no control and must raise the funds to pay the costs.
*228 Plaintiffs urge that the data reflected in Table I shows that the taxpayers are paying a discriminatorily greater tax than that paid by taxpayers in other counties for what are state functions. Further, unlike the public school financing cases, there is no input of local control or influence; hence there is no reasonable basis for this disparate treatment of persons paying for the same services which are state functions.
In respect to welfare costs, plaintiffs urge that there is no basis in fact for the statement found in many cases that the care of the needy historically was a problem for the municipalities. Further, in addition to there being no need for welfare to be administered by the counties, plaintiffs contend that a state-administered plan would eliminate one of the three levels of government presently involved and would be more effective and responsive. A corollary of the latter contention is that since the State should administer the federally assisted categorical programs, there is no need for the counties to have a "fiscal stake," i.e., pay a share of the benefits, to encourage efficiency.
Plaintiffs also urge that the disparities in tax burden reflected on Table II cannot be justified on any reasonable basis related to state policy and therefore the taxpayers are denied equal protection of the law.
The State urges that all statutes are presumed valid. It further urges, particularly in respect to welfare costs, that the State has left counties with no more than their historic share.
At this point the court notes that not all distinctions or disparities between groups work a violation of the concept of the equal protection of the law. Those classifications which a court finds reasonable may result in different burdens, but they are constitutionally permissible.
Strict adherence to a contrary position could have the effect of requiring absolute uniformity of treatment โ more specifically in the context of this case, uniformity of tax *229 burdens. As the Supreme Court stated in Robinson v. Cahill, supra:
* * * It is undeniable that local expenditures per pupil do vary, and generally because other essential services must also be met out of the same tax base and the total demands exceed what the local taxpayers are willing or able to endure. But for that same reason similar discrepancies, both as to benefits and burdens, can be found with respect to the other vital services which the State provides through its local subdivisions. The equal protection proposition potentially implicates the basic tenet of local government that there be local authority with concomitant fiscal responsibility. The case now before us was not tried or argued in terms that local government as a political institution denies equal protection in New Jersey because unequal demands upon unequal tax bases result in statewide inequality as to benefits or as to tax burden. In these circumstances we will not pursue the equal protection issue in the limited context of public education. [62 N.J. at 499-500]
The above-quoted language highlights the problem that if the equal protection of the law concept in the State Constitution requires that all benefits from governmental units be equal and all tax burdens be equal, then perhaps the only means of attaining that degree of uniformity might be to demand that the State exercise its constitutional power to operate all state and municipal services through the State and to levy all taxes through the State, thereby destroying all local authority and local fiscal responsibility.
The United States Supreme Court has heretofore refused to construe the Fourteenth Amendment to require perfect uniformity between units of local government within a particular state, for to do so would subject the separate states, which pursuant to their sovereign power create local governments, to control by the federal judiciary or the Congress. See San Antonio Indep. School Dist. v. Rodriguez, supra, 411 U.S. at 53-54, 93 S.Ct. 1278.
Unlike the situation in Robinson v. Cahill, plaintiffs are urging that their rights under the equal protection of the law are being violated. They contend that since all the costs that are at issue relate to state functions, the case does not present one where the independence of local units of *230 government is threatened โ i.e., it does not present the potential problem.
The latter contention is not correct. The cost burden is being passed to the municipalities which raise the taxes to pay for them and, at least in the case of welfare, to the counties to administer and deliver the benefits. The label of state function skips the question of whether the functions, like all municipal functions, are ones the State can or cannot delegate.
Notwithstanding the potential threat of the destruction of local government, as the Appellate Division noted in this case, Bonnett v. State, supra, 126 N.J. Super. 234, neither the United States Supreme Court nor our Supreme Court has said that no such cause of action can exist. Plaintiffs urge one here. The court considers it under the standards heretofore stated.
The court will first consider the costs of judiciary-administration (1). The order of consideration is (a) the courts, (b) prosecutor, (c) probation and (d) juries. The court will consider the costs of welfare second (2) because the history and development of the laws pertaining thereto involve factors different than those pertaining to judiciary-administration.

1. JUDICIARY-ADMINISTRATION
The aggregate of all the mandated costs for all counties in this State for 1973 was $128,781,000 for all functions, including welfare. Of this amount, $79,072,780 is attributable to welfare. $49,708,220 is attributable to the functions being considered in this section.
In Robinson v. Cahill, Chief Justice Weintraub, writing for a unanimous court, cautioned against the use of mechanical approaches in resolving constitutional problems. Plaintiffs say that since the basis for the services are either in the State Constitution or statute and the State supervises them closely, they must be state functions. The *231 approach suggested by plaintiffs ignores consideration of what the nature of the work done by the courts and agencies is, what were the historical means of financing their costs and what, if any, policy considerations led to the present system, what differences in the areas represented by the respective counties may produce the differences in burden, and what differences in the respective tax bases exist. These are factors the Legislature has a right to consider. The question is whether the counties are a reasonable basis for classification in relation to state policies based on these factors. The Legislature has not assigned the burdens to geographic areas in the form of specially created districts.
There is no material in the record regarding the historical means of financing the courts and prosecutors. The court has confined its consideration of the means of financing to the Public Laws and reported decisions, i.e., matters of which it may take judicial notice.

(a) COURTS
The history of the court system from the establishment of New Jersey as a proprietary colony on June 24, 1664 until the creation of the present court system by the State Constitution adopted in 1947 is outlined in McConnell, "A Brief History of the New Jersey Courts," 7 N.J. Digest 349 (1954), and is treated in detail in Clevinger and Keasly, The Courts of New Jersey (1903) for the period prior to 1900; see also 4 Proceedings of the Constitutional Convention of 1947, "Committee on the Judiciary."
The need for courts to resolve disputes between local residents led the colonists to establish justice of the peace courts which had limited criminal and civil jurisdiction. By the time of the 1947 Constitutional Convention about 2,500 such courts were authorized. They were authorized in terms of population, wards and towns. The justices of the peace received fees directly from those who used the courts. They were expressly prohibited from receiving any fees in excess of those allowed by statute, L. 1903, c. 165, ง 100, as *232 amended by L. 1923, c. 175, ง 2, or otherwise permitted. L. 1903, c. 165, ง 10. In certain municipalities the statutes authorized other local courts which superseded the justices of the peace. L. 1898, c. 228, ง 31, as amended by L. 1908, c. 49, ง 14. The work of such courts was geared to local interests and needs. The supervision of such courts by appeals to other courts was a function of the State pursuant to the right of a citizen to have the law applied equally. Although the provisions for justice of the peace courts were not carried forward by the 1947 State Constitution, such courts do exist today in several other states. They continue to fulfill a useful function, particularly where few attorneys exist who could sit as justices, by providing local forums to resolve disputes. See generally, "The Revival of the Justice of the Peace in Montana," 58 Judicature 373 (March 1975).
In colonial times a Supreme Court was established. It had jurisdiction similar to that of King's Bench in London. It existed until 1947. The Supreme Court had original and appellate statewide jurisdiction over all actions at law, civil and criminal. Two other courts were created to meet the need for faster administration of justice.
In 1704 a Court of Common Pleas was established for each county. It was a trial court, or court of original jurisdiction, for actions triable at common law. Its territorial jurisdiction was limited to the county in which it sat.
Circuit Courts were established in this State by an act passed June 6, 1799. Rev. 453; Griff. L.R. 1173. The practice and proceedings in the Supreme Court were extended to the Circuit Court. L. 1838, p. 64, ง 13. It had concurrent original jurisdiction in civil matters with the Supreme Court. Initially, Justices of the Supreme Court sat in this court but the Legislature provided for the appointment of judges who would sit only there. There were territorial limits to its jurisdiction because judgments entered were only effective in the county where it sat until separately docketed in the Supreme Court.
*233 In Dufford v. Decue, 31 N.J.L. 302, 307-308 (Sup. Ct. 1865), Chief Justice Beasley said neither the Common Pleas Courts nor the Circuit Courts had power to issue the prerogative writs, despite concurrent original civil jurisdiction with the Supreme Court, because by those writs the Supreme Court supervised many of the other courts and protected rights of the citizens as against local interests. This decision recognizes the difference between the courts intended to resolve matters between private parties and local issues, and those intended to act in a supervisory fashion and on questions of broader importance to the State.
The county clerk served as the clerk of the Court of Common Pleas, L. 1900, c. 140, ง 4, as amended by L. 1936, c. 200, ง 1; the clerk of the Court of Common Pleas served as the clerk of the Circuit Court, L. 1900, c. 149, ง 23. Fees were provided by statute for the clerk of the Court of Common Pleas or clerk of the Circuit Court. L. 1898, c. 230, ง 37. The clerk of the Circuit Court was required to set aside a portion of the fees he received for certain services for the sole use of the State. L. 1879, c. 209, ง 5, as amended by L. 1898, c. 81, ง 1.
The Governor initially acted as the Chancellor. Later the Legislature authorized a separate Chancery Court and appointment of a Chancellor to preside over it. It had jurisdiction over equitable matters. The Chancellor sat in Trenton. The Legislature later authorized the appointment of Vice-Chancellors who were assigned to cover vicinages consisting of several counties. The jurisdiction of the Chancery Court was statewide.
Until the 1844 Constitution the Governor, together with several members of the Legislature, constituted the highest court of appeal. The Court of Errors and Appeals was then established; it consisted of the members of the Supreme Court, the Chancellor and six judges specially appointed who were paid on a per diem basis. N.J. Const. (1844), Art. VI, ง II, par. 1.
*234 References to many courts that existed before the present system have been omitted for brevity. The nature of the work, the jurisdiction of the courts, and the need for some general supervision of the courts trying matters between parties shows that courts may be divided between those doing work of importance locally and those doing work of importance statewide. This is also reflected in the discussion at the 1947 Constitutional Convention. 1 Proceedings of the Constitutional Convention of 1947, Proceedings at 564-580.
The proposal for a fully integrated system of courts was not accepted. The representatives of the less populous counties urged the retention in each county of at least one court with the power of the Common Pleas Court and the criminal jurisdiction of other local courts. This view prevailed. N.J. Const. (1947), Art. VI, ง IV, par. 1. Those who favored the prevailing view spoke of the need for convenient access to the local courts.
The present system of courts is organized along a division of work which recognizes the need to assure uniform application of law by affording an appellate process through the provisions of the Supreme Court and the Appellate Division of the Superior Court. These costs are paid by the State.
The work of the Chancellor has been placed in the Chanvery Division of the Superior Court where costs are paid by the State.
The work of the former Supreme Court has in part been assigned to the Appellate Division and in part to the Law Division of the Superior Court, i.e., appellate work to the former and the prerogative writ and trial work to the latter. The State pays for the Appellate Division. The State pays the salaries of the judges for the Law Division, as it did for the Circuit Court judges. L. 1900, c. 149, ง 39. The State does not pay salaries for supportive personnel for the judges of the Law Division, N.J.S.A. 2A:11-9, as it does for the judges of the Chancery Division, N.J.S.A. 2A:11-8. *235 It does not pay rent for the Law Division courtrooms or chambers, as it does for the Supreme Court, Appellate Division of the Superior Court and the Chancery Division.
The State did not pay for the personnel of the Circuit Courts because the personnel of the Common Pleas Courts did the work for the Circuit Courts. However, the counties received the fees for the work done in such courts. L. 1900, c. 149, งง 22 and 23, but had to send a portion of such Circuit Court fees to the State as noted above. Today the State receives all fees for the Superior Court and refunds a portion to the county in which the action is to be tried. N.J.S.A. 22A:2-6.
Until about the time of the Civil War the judges and court personnel were paid fees by those who used the courts in both civil and criminal actions. See Paterson, Laws of New Jersey, at 418 et seq. (1799), for the beginning point. The court omits references to the various laws by which the system whereby the Governor, Chancellor, judges of the Supreme Court, prosecutors and court clerks were paid fees directly was gradually changed to the present one where they are placed on salary with a direction that the fees be paid to either the State, or the court, for the general treasury. The cases discussed infra, concerning prosecutors, suggest that the income from the fees exceeded the initial salary levels.
The evidence shows that the fees and commissions received in the Superior Court and Supreme Court substantially help to pay the costs of those courts, i.e., $6,467,675 revenue against $9,606,382 costs for those courts for the fiscal period ended June 30, 1972. Annual Report of the Administrative Director of the Courts, 1971-1972, at 146-147.
Analysis of the data used by plaintiffs to calculate the $1.76 per $1,000 of equalized valuation for judiciary-administration for the county for 1973 shows an aggregate of $5,353,274 for court costs in the county consisting of:

*236
 $ 838,651 County clerks-judicial function
 1,537,344 Sheriff-judicial function
 655,865 Superior Court, Law Division
 856,513 General County Courts
 1,088.078 County District Courts
 376,823 Juvenile and Domestic Relation Courts
 __________
 $5,365,274
 ==========

At oral argument plaintiffs stated that the county clerk and sheriff were not joined as defendants because they were locally elected officials. The costs attributable to their functions aggregate $2,375,995. The salaries for many who perform these functions, and their number, are not mandated by the State. They are determined to a substantial degree by the locally elected county clerk and sheriff.
The budgets for the State and the county are prepared for different fiscal periods. The budgets also contain broad categories, as do some of the underlying data. The budgets for the county for 1972 and 1973 are in evidence. The data used by plaintiffs is for the 1974 county budget. See Tables I and II. The court has taken judicial notice of the 1974 county budget. The amount of $655,865 for the Superior Court, Law Division, is correct but includes $140,000 for juries, which amount plaintiffs have also included in costs for juries. A similar error in the amount of $293,138 occurs for juries in the County Courts.[12]
The correct amount for the Superior Court, Law Division, is $515,865, of which about $406,690 is for the salaries of secretaries and law secretaries for the approximately 13 Judges of the Law Division assigned to the county, and for certain other personnel assigned to the office of the assignment judge.
*237 The county received $141,825 from the State from filing fees for complaints in the Law Division for matters assigned to the county pursuant to N.J.S.A. 22A:2-6, and $152,993 as reimbursement for 40% of the salaries of the judges of the County Courts, N.J.S.A. 2A:3-19. The county also received revenue from the County Court of about $179,345 (based on The Annual Report of The Administrative Director of the Courts, 1973-1974, at 231) and $491,773 from the County District Court based on the county budget. The aggregate of offsetting revenues is about $965,936, paid either by the state or persons who used the respective courts. If the $5,365,274 is corrected for the $433,138 assigned to jury costs by plaintiffs and the aggregate of state payments and fees totaling $965,936, the remainder is $3,966,200, of which $2,375,995 is substantially controlled by locally elected officials.[13]
Approximately 20% of all of the county's costs for courts are offset by fees or payments by the State. The ratio of fees to costs in the County District Court is significant. For 1973 the revenue for the County District Court was $491,774 as against a cost of $1,088,078. Similar cost ratios for other counties for the County District Courts exist in the less populous counties. For 1973 the revenue for the County District Court in Cape May was $12,084, and the cost $18,338, and for Hunterdon for 1973 the revenue-to-cost ratio was $14,986 to $37,020. The County District Courts are concerned almost completely with civil litigation.
It is not possible to compare with assurance of accuracy the ratio in other courts in other counties. The revenue data is taken from the section of the budgets labeled "County Clerk." In the county there is a register of deeds. In most counties the county clerk performs the function of the register *238 of deeds and hence the revenue from the office of the county clerk includes other items attributable to the function of a register of deeds; hence, this court suspects substantial amounts attributable to the County Courts is from recording deeds โ a nonjudicial function.
However, two factors pertaining to the working of the courts in the less populous counties do appear from the data and evidence. In a number of counties the same judges sit in the County Court, County District Court and Juvenile and Domestic Relations Court. This entails a saving in personnel costs for supportive personnel. In the less populous counties the number of criminal cases is substantially less than in the county. In fact, the criminal case load for the county is six times the aggregate of the criminal case load for the counties of Cape May, Sussex, Hunterdon and Warren. This necessarily entails greater expense without any significant offset in fees.
The fees in criminal cases have not been changed since they were first adopted in 1799. Compare N.J.S.A. 22A:3-1 et seq. with Paterson, Laws of New Jersey, at 423 (1799). The workload of the Public Defender suggests that even these modest fees are not paid in many cases.
The evidence suggests that the cost burden is less where there is a greater amount of civil litigation than criminal, and where the size of the court system lowers the ratio of supportive personnel to judges.

(b) PROSECUTOR
Historically, the Attorney General was the officer charged with prosecuting the criminal laws. By a series of enactments the Legislature authorized the Attorney General to appoint attorneys as prosecutors in the several counties to prosecute those who were indicted where he might be unable to attend in person. It later provided for the appointment of a prosecutor in each county on a regular basis. See State ex rel. Clawson v. Thompson, 20 N.J.L. 689, 690-691 (Sup. *239 Ct. 1846) (when a person holding the office of prosecutor, by appointment from the Legislature, accepted the office of Attorney General by appointment from the Governor, he vacated the office of prosecutor for a county because the offices were incompatible). See also, Lindabury v. Freeholders of Ocean, 47 N.J.L. 417, 424-425 (Sup. Ct. 1885).
The offices of Attorney General and prosecutor are specified in the State Constitution, N.J. Const. (1947), Art. V, ง IV, par. 3, and Art. VII, ง II, par. 1, respectively. The present division of responsibility between the Attorney General and the prosecutor has been discussed by the Supreme Court in Winne v. Bergen Cty., 21 N.J. 311 (1956), and Morss v. Forbes, 24 N.J. 341 (1957), where Justice Wachenfeld concluded:
In summary, although at common law the attorney general did in fact possess broad powers over criminal matters, his power and duties were, and are now, seemingly subject to definition by the Legislature. Such being the case, the Legislature has seen fit to work a pronounced deviation of authority within the executive structure, investing the county prosecutors with a jurisdiction formerly occupied by the attorney-general and largely excluding the latter from conducting criminal business within the various counties. The prosecutor is normally entitled to prosecute the criminal affairs of the State within the county, and without interference by the attorney-general. N.J.S. 2A:158-4. [24 N.J. at 370]
The Legislature has divided the work between the Attorney General and the prosecutors on the basis of what it believes to be state problems and local problems. It may well have considered the desire of the residents of the counties to have local citizens available to make discretionary judgments concerning whether or not to prosecute in given cases.
Further historical analysis reveals that there is another reason for the present system of financing the cost of the prosecutor โ that is, the elimination of the fee system whereby those who were accused of crime had to bear the entire burden of the office of the prosecutor. See Paterson, Laws of New Jersey, at 418-422 (1799), and N.J.S.A. *240 22A:3-2. The entire history of the change from that statute to the present may be documented through various acts providing for the salaries for state officers and the general appropriations for the State. For purposes of brevity, the court refers only to the comments in Woodruff v. Freeholders of Passaic, 42 N.J.L. 533 (Sup. Ct. 1880); Freeholders of Passaic County v. Stevenson, 46 N.J.L. 173 (E. & A. 1884).
In Woodruff v. Freeholders of Passaic, supra, plaintiff was appointed prosecutor prior to the adoption in 1880 of the salary act for prosecutors. Under the former law the prosecutor was entitled to be paid fees in each case by the accused, and from such fees he paid his assistants. The 1880 act provided that all fees should be paid to the county and the prosecutor paid a salary. The plaintiff sued to collect the $662 in fees for the period March 13, 1880 to June 14, 1880 instead of his salary of $500. This suggests that the fee system was then more attractive than payment of the salary fixed by law. The court held that the 1880 act did not apply to him since he had taken office before its enactment. It also held that the 1880 act was a special, and not a general, law.
In Freeholders of Passaic v. Stevenson, supra, the successor in office to Woodruff sued to collect fees under the system prevailing prior to 1880 on the ground that the 1880 act was invalid as special legislation. The Court of Errors and Appeals sustained the judgment of the trial court in favor of Stevenson. Justice Van Syckel, writing for the majority, noted that different salaries were set for different counties by name and not according to any classification based upon population or workload. He concluded:
The beneficial operation of this salutary constitutional provision [barring special legislation for municipalities or counties except upon notice โ ed.] will be greatly impaired by an interpretation which permits inequalities to any extent to be created throughout the state by special and local laws for the compensation of prosecutors of the pleas and judges of the Common Pleas of the several counties. * * * The imposition of the salaries of these officers upon the county in one instance, and their payment in all other counties out of the state treasury, and the payment of salary of one justice *241 of the Supreme Court by the counties in which he presides and of all others from the state treasury, would be extreme cases but they serve to show how clearly the internal affairs of a county may be controlled and regulated by such laws. [at 187-188].
The problem presented in Freeholders of Passaic v. Stevenson, supra, is not an issue that is referred to in the complaint or pretrial order. The present laws were adopted as general laws. However, both counsel for the Passaic Freeholders and the court had occasion to refer to the purpose of the acts adopted in 1880, where counsel urged:
* * * It was one of several acts intended to abolish the fee system and to provide for the payment of public officers by salary. The act providing for the payment of the justices of the Supreme Court and the Chancellor by a fixed salary was passed the same year. The object of the act in question was to wholly abolish the fee system as applied to the public prosecutors, and to establish a salary system in its stead. * * * [at 175-176].
The court concurred that this was the purpose. Id. at 182.
The fees were not abolished. They were directed to be paid to the State, or the county, depending upon the office or the judge. The criminal fees are so small that the costs of bookkeeping exceed any possible revenue; hence they are not collected in many cases. Further, a statute which permits a prosecutor to collect a fee of $5 if a defendant pleads guilty but $15 if he pleads not guilty and is convicted at trial, N.J.S.A. 22A:3-2, might post constitutional problems if those fees were adjusted to reflect inflation from 1799 when it was originally enacted, Paterson, Laws of New Jersey, at 418 (1799). Compare Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (statute providing fines for violation of state prohibition law which were divided between state and municipality and allowing hearing officer to keep costs in cases where defendant was convicted, held unconstitutional because hearing office has an interest in conviction); State v. Chinn, 146 W. Va. 610, 121 S.E.2d 610 (Sup. Ct. 1961) (statute providing that all fines be paid *242 into a fund from which magistrates were paid a salary and excess went to general treasury, held unconstitutional because magistrates had a potential interest to see that the fund was adequate.) See also, Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972).
Although the role of a judge and a prosecutor in the trial of criminal cases are vastly different, nevertheless the duty of a lawyer who is serving as a prosecutor is not to convict but to see that justice is done. State v. Grillo, 11 N.J. 173, 184 (1952). If the State made the compensation of the prosecutors depend upon whether convictions were obtained, the prosecutors would find it difficult to follow the aforementioned standard of conduct. That standard is also found in the Canons of Ethics.

(c) PROBATION
The probation departments now found in the several counties were authorized by the Legislature by L. 1929, c. 156. See N.J.S.A. 2A:168-1 to 13. As noted by the Supreme Court in Godfrey v. McGann, 37 N.J. 28, 35 (1962), one of the purposes of the Legislature was to help probationers adjust their relationships to their communities and to keep them producers in their communities and not public charges.
In Vanderwart v. Civil Service Dept., 19 N.J. 341, 348 (1955), the Supreme Court said that the people of Bergen County had an interest in a case concerning the appointment of an unfit person to the post of probation officer. Bergen County was not a necessary party because the power of appointment was given to the judges of the County Court. The people of Bergen County had an interest in having an effective probation department that went beyond the duty of raising money to support it.
Although the Supreme Court has recognized that the duties of probation officers do not relate solely to the interests of a county, In re Salaries, Probation Officers, Bergen Cty., 58 N.J. 422 (1971), because of their work for *243 the Superior Court as well as the County Court and Juvenile and Domestic Relations Court.
In Godfrey v. McGann, supra, the Supreme Court said:
The county is an agency of the State to administer state power and authority. Bergen County v. Port of New York Authority, 32 N.J. 303, 312 (1960). One of the county's principal roles is to help provide for the operation of the state judicial system within its borders. Accordingly, the taxpayers of the county bear a proper share of the cost of administering the judicial system within the county. The allocation of expenses to be paid by the taxpayers of the whole State and those to be paid by taxpayers of a county is a matter for legislative decision.
The Probation Department in each county operates as an enforcement arm of the state judicial system. The establishment and operation of this department in each county is regulated by N.J.S. 2A:168-1 to 13, N.J.S.A. By N.J.S.A. 2A:168-1, 3, 11 and 13 N.J.S.A. it is charged with implementing probation orders of the courts within the county; making such investigations as these courts may order concerning persons involved in proceedings before them; and collecting and disbursing moneys as these courts may order. For the most part, because of venue limitations, R.R. 3:6-1 and R.R. 6:3-1, the persons thus affected by the Probation Department are residents of the particular county in which the department is located. Moreover, most of the fines imposed by the courts are paid over to either the county or municipalities within the county. See N.J.S. 2A:7-13, 2A:166-10, and 2A:169-9 N.J.S.A.; see also City of Passaic v. Passaic County, 54 N.J. Super. 254 (App. Div. 1959). And in most instances, support and alimony payments are collected for the benefit of residents of the county. [37 N.J. at 34]
And concluded:
Thus while the Probation Department in each county is established for the good of the whole State, it can be said to exist primarily for the benefit of the local residents. * * * [at 35]
The material in the record in this case confirms the observations of the Supreme Court that the work of the probation departments is of primary benefit to the residents of the several counties.

*244 (d) JURIES
Analysis of the data pertaining to the costs for jury commissioners and grand and petit juries reveals that those costs are related to the population of, and workloads in, the several counties. See Annual Report of the Administrative Director of the Courts, 1971-1972, at 149-150, and Tables D-2, D-3 and D-10 as well as Table IV, supra. The work of grand juries normally relates to violations of the criminal laws within the several counties, or presentments concerning public problems in the several counties. Because of the rules pertaining to venue, R. 3:14-1 in criminal cases and R. 4:3-2 in civil cases, the parties to, or the events which are the subject matter of a trial have some connection to the county where the trial is held. The jurors are normally drawn from the citizens of that county. The citizens of the county in which the trial is held normally have the primary interest in the matter.
Through the assignment judge and the jury commissioners for each county the State exercises certain supervision over the selection of potential jurors and their availability for service. In re Supervision and Assignment of Petit Jury Panels, etc., 114 N.J. Super. 527 (Law Div. 1971). This does not change the fact that such juries render a service that is of primary benefit to residents of each county. Table IV indicates population of a county bears a strong relation to costs.
The amount to be paid to a juror is set at $5 a day by the State, but the board of chosen freeholders of any county may set a lower amount if it desires. N.J.S.A. 22A:1-1.
The court finds that the State has retained a supervisory power and a power of appointment of certain key personnel in respect to the performance of the functions of the prosecutor, probation and juries, as well as the County Court, County District Court and Juvenile and Domestic Relations Court, but otherwise has delegated the performance of those functions to the counties. The persons appointed *245 to these positions are residents of the respective counties. There is significant control over salaries and staff levels by several locally elected officials. The court finds the delegation consistent with the State Constitution. Robinson v. Cahill, supra, 62 N.J. at 513.
The same findings as to delegation of functions of the Law Division of the Superior Court to the counties cannot be made. The Superior Court, including the Law Division, is a state court. The question then, is whether the State can impose the obligation of paying for $406,690.23 for the Law Division of the Superior Court upon the taxpayers in a constitutional manner.
The courts of other states have held statutes constitutional which required different levels of government to contribute to the costs of courts, on the grounds that all levels of government had a valid interest in seeing the laws enforced. City of Chicago v. Board of Com'rs, Cook Cty., 355 Ill. 244, 189 N.E. 26 (Sup. Ct. 1934) (a legislature may constitutionally require a county to pay all costs for jury commissioners and juries, including costs of juries provided to city courts). This has been done under the principle of commutation, i.e., that all levels of government have an interest in enforcement of law, and requiring contribution from one level of government to defray part of the cost of a court in a particular community does not violate constitutional guarantees. In Young v. City of Kansas City, 152 Mo. 661, 54 S.W. 535 (1899), the Supreme Court held constitutional a statute requiring Kansas City to pay for the salaries of the court reporters in the criminal courts of the county sitting in Kansas City. The court said:
* * * The duty of providing courts of justice is a governmental function of the state alone, and she can require a given locality to provide funds for the support of those courts created for such locality. State v. Mason (not yet officially reported) [153 Mo. 23], 54 S.W. 524. This was held long ago in Hamilton v. St. Louis County Court, 15 Mo. 3, 20, and reaffirmed in State v. Field, 119 *246 Mo. 593, 24 S.W. 752, in which last case it was said, `We deem it within the power of the legislature to impose a tax upon a particular subdivision or municipality of the state, when in its judgment it is for the benefit of that locality as well as the state at large.' * * * [152 Mo. at 666, 54 S.W. at 536-537]
The Law Division of the Superior Court does try and decide the cases involving the actions in lieu of prerogative writs, which is perhaps a state function. But it also tries a substantial number of negligence, tort and contract actions, as well as a substantial volume of criminal cases which otherwise would be tried in the County Courts, with consequent greater need for County Courts at the expense of the counties, including the county.
Recognizing the principle of commutation and attendant savings to the counties, including the county, the court finds that the imposition of the costs for the Law Division of the Superior Court does not violate constitutional safeguards.
The court further finds that there is a reasonable basis for the allocation of costs between state functions such as the Supreme Court, Appellate Division, Chancery Division, and the costs for local interests for the prosecutor, juries and probation and the local courts. The greatest benefit from the latter is received in the counties where the costs are incurred and the taxes raised.
The State has recognized its responsibility by providing that it should pay for the Criminal Division of the Attorney General's office, the statewide grand juries, N.J.S.A. 2A: 73A-9, and the Public Defender system, N.J.S.A. 2A: 158A-1 et seq There is still support for the view that local communities should bear some responsibility for the cost of local crime. A. & B. Auto Stores of Jones St., Inc. v. Newark, 59 N.J. 5 (1971).
As noted above, under the concept of the equal protection of the law under both the Federal and State Constitutions, the Legislature is given broad discretion to determine how *247 to allocate the responsibility for delivery of services and the related tax burdens. Within the framework of those concepts the courts should be careful in striking down the system developed by a legislature. In San Antonio Indep. School Dist. v. Rodriguez, supra, Chief Justice Burger said:
* * * appellees would have the Court intrude in an area in which it has traditionally deferred to state legislatures. This Court has often admonished against such interference with the State's fiscal policies under the Equal Protection Clause:
"The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized. * * * [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. * * * [T]he presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. * * *" Madden v. Kentucky, 309 U.S. 83, 87-88, 60 S.Ct. 406, 408, 84 L.Ed. 590 (1940).
See also Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973); Wisconsin v. J.C. Penney Co., 311 U.S. 435, 445, 61 S.Ct. 246, 250, 85 L.Ed. 267 (1940). [411 U.S. at 40-41, 93 S.Ct. at 1300-1301, 36 L.Ed.2d at 47-48]
The Legislature's utilization of the counties is the use of branches of government that it has created to administer government on a local level over established regions, less than statewide in scope. It does not depend upon specially created districts.
The counties with the greatest concentration of burden are among those where business pays the larger shares of local real estate taxes.
Mr. Gerald M. Dowgin, a senior tax analyst who works in Mr. Arnold's office, testified about certain studies he has made concerning which classes of real property pay what percentage of the tax. These are published annually in the November issue of New Jersey Municipalities. The following *248 table is prepared from exhibits at trial taken from 1973 and 1974 volumes of that magazine.

 TABLE V
Percent of All Property Taxes Paid by Business by County
 Ten Highest 1973 1974
 Hudson 60.82 59.6
 Essex 45.15 43.6
 Atlantic 40.16 41.3
 Middlesex 37.95 38.5
 Union 36.49 36.7
 Salem 36.68 35.6
 Mercer 36.17 36.2
 Camden 36.03 35.9
 Passaic 34.88 35.6

In reviewing Tables I and II the counties with the greatest burdens include those counties in which five of the six largest cities, historically the centers of wealth and commerce, are located: Hudson (Jersey City); Essex (Newark); Passaic (Paterson); Camden (Camden); Mercer (Trenton). The sixth largest city is Elizabeth, which is in Union County. Table V shows that the counties with the greatest burdens and the major cities still have a substantial concentration of business and industrial property. Thus, these counties have a significant percentage of taxes which are paid by business to defray their burdens.
The testimony of Arnold makes it clear that this pattern is in the process of changing. He explained that when he began working on tax problems in New Jersey in 1938 the problem was how to tax the wealth in the six largest cities to help pay for schools and roads in the farm areas. As a result of the rash of sudden increase in assessments on the intangibles of corporations which had registered offices in the large cities, in 1945 the Legislature repealed the municipal power to tax intangibles and enacted The Corporation Business *249 Tax. L. 1945, c. 162, ง 1 et seq. N.J.S.A. 54:10A-1 et seq. The State collected the tax and used it for school and road aid. Today the problem is how to help the six central cities and the areas immediately adjacent to them.
When the revenues from the tax on tangible business personal property and the sales tax became available, the Legislature did make revenues available to the urban areas to help. Newark is presently assured $15 million from the tangible business personal property tax and a right to share in the surplus without credit for the $15 million. Thus, even though some of such property which was in Newark as of the guarantee date may no longer be in Newark, it is receiving revenue from it. The State has assumed the responsibility of operating Martland Hospital, formerly operated as the City Hospital for Newark. N.J.S.A. 18A:64G-17. The State now pays the costs.
This action concerns the taxpayers. The question is whether they are being made the victims of a "hostile and oppressive discrimination." The court finds that they are not.
The record discloses, and the court has previously found, that the present system allocates cost burdens in terms of statewide interests and local interests, provides for supervision to afford uniformity and equality of treatment, avoids dependence upon a fee system for the administration of justice, and recognizes to a limited extent local responsibility to control local crime. In certain areas locally elected officials do have substantial control over cost.
The Legislature may well determine that raising fees to offset costs of the courts fully would tend to limit access to the courts to the rich who could pay, and to the poor who could file for waiver of costs. Under present resources the Legislature may reasonably determine it is better to have broader access to the courts for the people and place some of the burden on the taxpayers.
The present system is not dissimilar to the systems existing in many states. See the cases collected in Annotation, "Scope *250 and Effect of Express Constitutional Provisions Prohibiting Legislature from Imposing Taxes for County and Corporate Purposes, or Providing That Legislature May Invest Power to Levy Such Taxes in the Local Authorities," 46 A.L.R. 609 (1927), 106 A.L.R. 906 (1937).
The evidence does not establish that any of the costs at issue in this matter have caused a difference in the assessment ratios between business and residential property, although it does show that such differences exist.
The owners of business real property are included within the class of taxpayers. They pay taxes based on the assessment value of such property. The fact that they pay a high percentage of the total tax in some of the counties, including the county, does not violate the guarantee of equal protection of the law. Conceptually, the higher percentage is due to the fact that there is a greater amount of business real property values than residential values. If the assessment ratios are not proper, the remedy is to have the assessments redone. The fact that each business may not derive a direct dollar-for-dollar benefit for each dollar of tax paid does not violate the concept of the Equal Protection Clause. Carmichael v. Southern Coal & Coke Co., supra.
Recognizing that the Legislature, with limited resources available, cannot cure all ills at one time, Dandridge v. Williams, supra, and must be allowed to proceed one step at a time, Schilb v. Kuebel, 404 U.S. 357, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971), the court concludes that the statutes underlying the present system for financing the residual costs of judiciary-administration functions do not violate the concepts of equal protection of the law embodied in the Fourteenth Amendment and the State Constitution.

2. WELFARE
The Cost burdens for welfare which are the subject matter of this action are the 12 1/2% of benefit payments that the counties had to pay under the federally assisted categorical welfare programs in which the State participated during the *251 year 1973 and the unreimbursed costs of administration for such programs which the counties paid. In addition, there is another state program, Assistance to Families of the Working Poor, N.J.S.A. 44:13-1 et seq., under which there is no federal assistance. The State pays 75% of the costs of benefits, and counties pay 25% of such costs as well as all costs of administration. The background of this program is described below.
The aggregate cost for all counties in 1973 was $79,072,780. According to plaintiffs' exhibits, in 1973 the county's share was $21,890,982.
Plaintiffs urge that Table II and the corresponding Table in the Appendix reflect the differences in tax burden among taxpayers in the respective counties. They point to the enormity of the disparities. In gross dollars the county pays 2-1/3 times what Camden County pays and three times as much as Hudson. Yet Lazaro testified that these three counties collectively had one-half the cases under the AFDC program. The County pays almost ten times as much as Bergen.
The support for the premise that the functions relating to welfare are state functions differs from that regarding the functions discussed above. This premise has two legs to support it. First, plaintiffs urge that the welfare costs that are the subject matter of the action are part of the burden of the economic system we live with and are part of the federal system. Therefore, they differ from the old laws dealing with poor relief and paupers. They go further and say that the language found in some decisions, such as Lindsay v. Wyman, supra, 372 F. Supp. at 1369, that "assistance to the needy has been the primary responsibility of the immediate locality * * *," at best is a simple misreading and distortion of historical fact.
Second, the State alone had, and has, the power to determine whether such programs shall exist in the State; hence, if the State elects to go into the programs, they should be looked at as state programs.
*252 Plaintiffs then urge that if one examines the operation of the present system one cannot justify the delegation of the administration to the counties, for a state-administered plan would be more efficient. Since the prime justification for the counties paying any portion of the benefit costs is to assure that those who administer it must have a "fiscal stake" and there is no justification for counties to administer the programs, there is no rational basis upon which the Legislature can have determined that the cost burdens should be distributed to the counties.
The State relies upon the presumption of validity of the statutes. It also urges that the present system relieved localities of other burdens that historically would have been theirs, so that the 12 1/2% of cost benefits is a fair burden.
The State has also contended that plaintiffs never made the cost of administration an issue and hence it is not in the case. Paragraph 8 of the third count and the evidence at trial all were directed to the costs of administration. See notes to Table II, supra. The court concludes the cost of administration is an issue.
The court will first set forth the historical development of the programs under (a). The court will then consider (b), the contention that since state administration would be better than the present alleged inefficient and cumbersome administration by counties, there can be no rational basis for the Legislature's choice; and (c) the contention that State's determination to enter the programs makes them the State's responsibility which cannot be delegated.

(a) Historical Background
From the colonial period of the State until the economic depression of the 1930s the State imposed the whole burden of relief upon private charity, the counties and the municipalities (except for programs to provide aid to children and aid to the blind, discussed infra). The history of the legislation giving the municipalities the power to levy taxes *253 to give relief to the poor is set forth in Freeholders of Atlantic County v. Tilton, 39 N.J.L. 605 (Sup. Ct. 1877).
The county sued the town to compel it to levy taxes for support of the county poorhouse. The town resisted on the ground that under the law recently passed to create the town it had power to levy taxes to relieve the poor, and therefore its charter repealed the law authorizing the county to levy a tax for the poor in respect to the town. The court granted a writ of mandamus. It said that since the time of the enactment of the two laws, towns had power to levy taxes to relieve the poor, and only in cases where a town had built its own almshouse, either before the enactment of the county law or after making demand on the freeholders for an almshouse and being refused, was a town exempt. The court concluded:
* * * All the poor are not necessarily sent to the poor-house, either county or township. It has long been the practice in this state for townships, in counties where a poor-house exists, to raise money for poor purposes beside the levy, under the order of the board of freeholders. The relief of the casual poor is provided for out of such fund. Where a temporary misfortune befalls the head of a family, rendering public relief for the time necessary, it is not the policy of the law nor of humanity, to break up the household, and send its members to the poor-house, when partial and temporary relief may serve to bridge over the misfortune and preserve the home. The practice of granting such relief by the township is legal and commendable; and the power given to Hammonton to raise money for poor purposes, will enable that town thus to minister to its casual poor. * * * [at 611]
The economic conditions of the 1930s created a state of affairs that the normal resources of local communities could not meet. See City and County of San Francisco v. Collins, 216 Cal. 187, 13 P.2d 912 (Sup. Ct. 1932) (court upheld issuance of $6 million in bonds to provide sufficient immediate cash for relief because sufficient monies could not be raised under the taxing power). The State in 1931 broadened the powers of the counties and municipalities to levy taxes for temporary relief and to work together to provide such relief. L. 1931, c. 393.
*254 By L. 1936, c. 83, the Legislature determined that the State should be involved in providing financial assistance to municipalities from state resources and federal aid; however, the Legislature expressly stated in ง 1 of said law what the public policy of the State had always been:
It is hereby declared to be the public policy of this State that every needy person shall, while in the State of New Jersey, be entitled to receive such public assistance as may be necessary. All needy persons not otherwise provided for under the laws of this State shall hereafter receive public assistance pursuant to the provisions of this act. The furnishing of such public assistance is primarily the duty of the municipality and of civic and charitable organizations.
This remains the declared public policy of the State. N.J.S.A. 44:8-109. East Orange v. McCorkle, 99 N.J. Super. 36, 41 (App. Div. 1968).
The public policy of the State was consistent with that of the common law and that of most other states. In 70 C.J.S. Paupers ง 3 at 10, it is stated:
At common law, and in the absence of any constitutional mandate with respect thereto, the public authorities have no obligation to support or assist paupers; and any such duty rests entirely on statute. While it has been broadly stated that the government has a duty to make suitable provision for its needy citizens who are unable to provide for themselves, it has more precisely been held that the obligation of supporting needy citizens is a humanitarian one which the state may voluntarily assume or may impose on local governmental units.
See also, 79 Am. Jur.2d, Welfare Laws, งง 1 and 2 at 90-91; Attorney-General v. Board of Public Welfare, 313 Mass. 675, 48 N.E.2d 689 (Sup. Jud. Ct. 1943); State v. County Court of Malheur County, supra. The New Jersey historical experience is similar to that of the State of New York traced by Judge Gurfein in Lindsay v. Wyman, supra, 372 F. Supp. at 1369-1370. The court rejects the contention that there is no historical basis for local involvement.
*255 In 1935 and 1936 the State realized that the enormous costs of welfare required it to participate in the federal programs provided for in the Social Security Act of 1935. At that time the State had three existing categorical programs. The State Board of Childrens Guardians administered a program for aid to dependent children under L. 1899, p. 362. The Commission for Amelioration of the Condition of the Blind provided aid to the blind under L. 1918, c. 147, ง 651. L. 1931, c. 373, ง 3 authorized counties to establish a county welfare board, after the voters approved at a public referendum, to replace overseers of the poor and administer aid to the poor and manage county welfare houses. L. 1931, c. 219, provided a program for relief to the aged. The State paid 75% of the cost and each county 25%. The State supervised the program through the Division of Old Age Relief created in the Department of Institutions and Agencies, but either the county welfare board administered it in the counties where such boards existed, or the board of freeholders of a county had to establish a bureau for old age relief. This program was separate from the programs for paupers.
The Social Security Act of 1935 offered aid to dependent children (AFDC) 42 U.S.C.A. ง 601 et seq.; aid to the blind (AB), 42 U.S.C.A. ง 801 et seq., and aid to the aged (OAA), 42 U.S.C.A. ง 301 et seq., under conditions whereby the Federal Government would pay, and does pay, 50% of the benefit costs and certain costs of administration. Each State determines what the level of need is and what percentage of that need shall be paid in benefits.
Any state could participate in any one or more of the programs as it chose. It had to submit a plan that would provide benefits uniformly throughout the state. It had to agree to see that the program was administered uniformly throughout the state.
In respect to financial participation under the federally assisted categorical programs with which this case is concerned, the law provides in 42 U.S.C.A. ง 602 (AFDC):

*256 (a) A State plan for aid and services to needy families with children must (1) provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them; (2) provide for financial participation by the State; * * *.
Similar provisions are found in the laws authorizing the other programs.
The applicable regulations recognized that there is no federal requirement for local participation. 45 C.F.R. ง 205.130 (1975), relating to state financial participation, provides:

State plan requirements
(a) A State plan until [under] title I, IV-A, VI, X, XIV, XVI, or XIX of the Social Security Act must provide that:
(1) State (as distinguished from local) funds will be used in both assistance and administration; and
(2) State and Federal funds will be apportioned among the political subdivisions of the State on a basis consistent with equitable treatment of individuals in similar circumstances throughout the State.
(b) A State plan under title I, IV-A, X, XIV, or XV of the Act must provide further that State funds will be used to pay a substantial part of the total cost of the assistance programs.
(c) A State plan under title XIX of the Act must provide further that the State funds will be used to pay not less than 40 percentum of the non Federal share of the total expenditures under the plan and either:
(1) State funds will be used to pay all of the non Federal share of the total expenditures under the plan, or
(2) If there is local financial participation there will be a method of apportioning State and Federal funds among the political subdivisions of the State on an equalization or other basis that will assure that lack of funds from local sources does not result in lowering the amount, duration, scope, or quality of care and services or level of administration under the plan in any part of the State.
Subparagraph (c) above covers the Medicaid program. It is not in issue because State pays all nonfederal costs.
No issue is presented in this case that any individual has been denied benefits or received inadequate benefits under the present system, or that this regulation has been violated.
*257 The federal and state funds under the present system are allocated to the counties on the basis of reimbursing them for 87 1/2% of the cost of benefits paid and for a percentage of administrative costs ranging from 10% to 90%, depending upon the type of work.
The State determined to participate in all three programs and to utilize the then existing agencies to administer the programs, i.e., the State Board of Childrens Guardians for AFDC, the Commission for the Blind for AB, and the county welfare boards for OAA. To assure that each county had a county welfare board the Legislature mandated that each county establish one. L. 1936, c. 31, ง 5.
In respect to each of these programs, including those administered by the State, the Legislature provided that each county should pay 25% of the cost of benefit paid to persons who were residents in such county. L. 1936, c. 33; L. 1959, c. 86 (AFDC); L. 1936, c. 30 (AB) and L. 1936, c. 31 (OAA). This is analogous to the requirement under the laws for relief for the poor administered by the municipalities, that the municipalities are responsible for the persons who are determined to have settlements in said municipalities. N.J.S.A. 44:1-87. Settlement is defined by N.J.S.A. 44:1-102. This concept has been in such laws from colonial times. Paterson, Laws of New Jersey at 26 (1774).
The testimony at trial established that during the period the State administered two of the then three categorical programs, the state agencies did check with the respective county welfare boards to verify items. Three separate agencies had to train personnel to make eligibility determinations. The counties paid the State on a reimbursement basis (paid after expense incurred) in two programs. The State paid counties on a reimbursement basis for the third program.
A committee appointed to study the operation of that system recommended that all administration in terms of contact with prospective recipients to determine eligibility and continued eligibility, be centralized in the respective *258 county welfare boards for the federally assisted categorical welfare program. Report of the Commission to Study Welfare Administration (1953). In 1959 the Legislature adopted this suggestion and transferred the administration pertaining to recipient contact and benefit disbursement to the county welfare boards. See N.J.S.A. 44:7-1 et seq. and N.J.S.A. 44:10-1 et seq.
Congress amended the Social Security Act of 1935 in 1950 to make a program for assistance available to those who are permanently and totally disabled (APTD). Social Security Amendments of 1950, Pub. L. No. 81-734, c. 809, Title III, Pt. 5, ง 351, 64 Stat. 555 adding 42 U.S.C.A. ง 1351. The Legislature adopted legislation to authorize the State to participate in that program. The State filed a statewide plan, which was approved. The Legislature directed the county welfare boards to administer it. L. 1951, c. 139.
In 1967 Congress amended the Social Security Act of 1935 to provide assistance to children who were in families where a parent was unemployed and ineligible for unemployment benefits or where the income of those members of the family who did work was below a stated minimum. Social Security Amendments of 1967, Pub. L. No. 90-248, Title II, งง 202-203, 81 Stat. 821. See also, 2 U.S. Code Cong. & Admin. News 1967, at 2981 et seq.
The Legislature authorized adoption of this program in 1968. L. 1968, c. 138. These changes added two new categories to the AFDC program โ AFDC-U (unemployed) and AFDC-N (insufficient income) โ and applied to families where both parents were living. The Legislature directed county welfare boards to administer the programs.
The purpose of the changes was to encourage those on welfare to work. Prior to the change, if a parent or child worked, the income was a direct offset in determining income eligibility, subject to minor allowances. Many families who could obtain work in marginal jobs were therefore made ineligible if they took them. The result was that such individuals found it more advantageous not to work. The changes *259 permitted a person who was on welfare and who obtained work to have one-third of the earnings excluded in the computations of available income, subject to certain limits.
Whatever the experience elsewhere, the State found that the eligible case load soared, benefit costs soared, and abuses arose. The fiscal stability of the entire welfare program was placed in jeopardy. See Motyka v. McCorkle, 58 N.J. 165, 171-174 (1971).
During the late 1960s and early 1970s each Governor kept a committee at work studying the problems of the cost and efficiency of the welfare programs. The final report includes a summary of earlier reports. It is entitled A State Welfare System for New Jersey (1971). It is part of the stipulated evidence. It recommended that the State assume all welfare costs but recognized that there were tremendous fiscal problems. It suggested that the State might initially take over administration and let the counties continue to pay for part of the cost of benefit payments.
Because of the cost burdens the Legislature decided on a different course of action. To reduce the clerical work and hence the personnel required in making initial eligibility determinations, the State substituted a system of flat grants for the then existing system under which a welfare worker determined a specific budget for each family on the basis of reasonableness of cost. This was sustained. New Jersey Welfare Rights Org. v. Cahill, 349 F. Supp. 501 (D.N.J. 1972).
To reduce costs the Legislature repealed the 1968 laws for AFDC-U and N, L. 1971, c. 210, and adopted the program for Assistance to Families of the Working Poor (AFWP). L. 1971, c. 209; N.J.S.A. 44:13-1 et seq. In essence, this law set tighter eligibility requirements. Federal authority determined that this state plan did not meet the criteria of 42 U.S.C.A. ง 602(a)(7) and (8) and ง 607, and denied federal assistance. The effect under the language of N.J.S.A. 44:13-11 was to compel the State to pay 75%, instead of 37 1/2%, of the program, and the counties *260 to pay 25%, instead of 12 1/2%, as well as the costs of administration.
In 1968 the Legislature reduced the percentage of cost of benefits that each of the counties must pay from 25% to 12 1/2% for all the federally assisted categorical programs. L. 1968, c. 138, ง 3, and c. 139, งง 2, 5, 6, 7, codified in N.J.S.A. 44:10-5, 44:7-25, 7-40, 7-46 and 7-82. In that year the Legislature also enacted a Medicaid program to provide for medical coverage for those under the federally assisted categorical programs. L. 1968, c. 413; N.J.S.A. 30:4D-1 et seq. The State pays for all matching funds at the present time. This program reduces the cost burden on local municipalities for medical care which the decision in East Orange v. McCorkle, supra, placed upon them.
At the time the complaint was filed the County was obligated to pay 12 1/2% of the cost of benefits and the unreimbursed cost of administration of the federally assisted categorical programs for OAA, APTD, AB and AFDC, as well as 25% of the costs of benefits and all administrative costs for AFWP under the state program.
In 1972 Congress again amended the Social Security Act of 1935. It has adopted the Supplemental Security Income Law. Pub. L. No. 92-603, Title III, ง 301, 86 Stat. 1465 (codified in 42 U.S.C.A. ง 1381 et seq.), effective January 1, 1974. Under this program, the Federal Government has assumed the sole responsibility for payment of the cost of basic benefits and disbursements to individuals who have attained the age of 65, are blind or are disabled.
The notes to 42 U.S.C.A. ง 1381 et seq. set forth the projected transition dates and phases of the program. When this became effective Lazaro testified that the County was relieved of 1,000 cases but not all costs. The Federal Government has agreed to hold those who were participating financially harmless from any increase in their cost for benefits beyond the December 1972 level. See notes following 42 U.S.C.A. ง 1382e. To the extent that basic benefits are below the level paid in a state in a prior period, those persons *261 who were receiving such benefits at a higher level in a prior period continue to receive them and the state must pay the difference between the benefit levels. See Pub. L. No. 93-66, Title II, ง 212, 87 Stat. 154, as amended by Pub. L. No. 93-233, ง 10, 87 Stat. 947 and Pub. L. No. 93-335, ง 2(a), 88 Stat. 291, as set forth in the notes following 42 U.S.C.A. ง 1382. Under implementing laws the State pays 75% of this difference and the county in which a beneficiary resides pays 25%. For 1974 the county budgeted $1,200,000 for this cost. For 1973 the county paid an aggregate of $1,345,000 for the benefit costs for the OAA, APTD and AB programs.
Lazaro testified at trial that the county was still doing the work for determination of eligibilty and certification of continued eligibility. The notes just referred to indicate that the Federal Government is supposed to assume this work in 1975. The regulations for programs for social services for those under the SSI program will be changed. See 45 C.F.R., Parts 220, 221, 222 (1974).
From this background the court finds that the evidence pertaining to the federally assisted AFDC program and the state AFWP program is what should be considered in light of the implementation of the SSI program and the prospective reduction in costs to the county.

(b) Is there a rational basis for compelling the county to contribute fiscally?
Under the present system the federal, state and county governments are involved in the administration of the categorical welfare program for AFDC, and the State and the county for AFWP.
Lazaro testified that as of January 1, 1960, when the county was directed to administer the AFDC program (L. 1959, c. 86, ง 2; N.J.S.A. 44:10-2), there were 3,300 AFDC cases. In 1967 there were 16,700 cases. Between 1968 and 1971 the case load increased 4,000 annually in the *262 county until it reached 28,000 cases at the end of 1971. Thereafter the annual increase dropped to 200 in 1972 but increased again with the onset of the recession. At trial there were about 33,000 cases.
As previously stated, in 1968 Congress made a number of changes in the Social Security Act of 1935 to encourage those on welfare to work. Congress also enacted a series of laws administered by the United States Department of Labor, popularly called the WIN program, which is related to the AFDC program. See 42 U.S.C.A. ง 630 et seq. Under this program mothers of dependent children are required to be registered under the WIN program to maintain continued eligibility under the AFDC program.
Lazaro explained the complexities and frustrations of trying to keep personnel and welfare recipients informed of the requirements. There are 11,000 welfare mothers in the county. There are 750 jobs available. Nevertheless, the county must re-certify that each mother is properly registered and otherwise meets the income test at the end of each six-month period in which the mother is on welfare. If the certifications are not made, or if an error in arithmetic is is made, the recipient is classified as ineligible. Under present regulations the County is subject to fiscal sanctions, i.e., losing a percentage of reimbursement for benefits paid, depending on the percentage of error.
Lazaro also explained that the Department of Public Welfare supplements the federal regulation with its own regulations, guidelines and policy statements. The State must approve the budget for a county welfare board before the board of freeholders acts on it. The State has insisted on tight control of personnel policies. This has resulted in litigation between personnel, county welfare boards and the State. See Communications Workers v. Union Cty. Welfare Bd., 126 N.J. Super. 517 (App. Div. 1974).
Changes in policy at either Federal or State level can create tremendous problems. The Federal Government recently *263 issued regulations that increased the need for clerical staff to determine income maintenance and reduced the need for social workers. The result was that the county had too many social workers and not enough clerical staff. Some social workers elected to take clerical positions because of the recession, and thereby problems under Civil Service laws developed.
Lazaro said that the county personnel had little chance to develop systems of their own because of all the regulations and tight control.
The 1974 county budget showed that the $21,890,982 cost for welfare for the county in 1973 used by plaintiffs, $6,962,535 was paid for administration. The court has assumed that these are the unreimbursed costs. One of the State's exhibits shows that for 1973, administration costs for the county were $15,080,268. The county was reimbursed for 65.41% of this, or $9,864,223. Reimbursement for administration ranges between 10% and 90%, depending on the function.
Dr. Jack Brizius, Jr. testified for plaintiffs. He has an impressive academic record at Princeton University where he received his Ph.D.; the subject of his doctoral dissertation was social services in public welfare programs. He served as deputy director of the Governor's Task Force on Welfare Reform under Governors Hughes and Cahill. At the time of trial he was Director of Human Services Planning in the Department of Institutions and Agencies.
Brizius confirmed much of Lazaro's testimony about the problems of the three-tiered system in welfare administration. The upper tiers are interested in overall costs, the county with minimizing its dollar expenditure. Brizius said that initially the Federal Government believed that all those on welfare needed the assistance of social workers to straighten out the recipient's problems. Experience showed that there were many on the OAA, AB, APTD programs in particular who were mature and capable of handling their own affairs *264 but because of age, blindness or disability had inadequate income.
While this policy prevailed, it paid the county to have social workers do income determinations even if their salary was higher, for the percentage of federal reimbursement for administration costs varied from 90% for social workers to 50% for clerical workers. Thus, for example, a social worker receiving $12,000 cost the county $1,200. For $6,000 the county could hire five social workers. For $6,000 the county could hire only two clerks at $6,000 apiece because it was reimbursed at a 50% rate, or $3,000 a clerk. The illustration may be repeated in different ways.
The record establishes that there have been problems in determining income eligibility because of regulations, inaccurate information from potential recipients and recipients due to communication problems, as well as some fraud cases, arithmetic errors and turn over in personnel. Low salaries, which keep budget estimates down, force good workers to leave. New workers have to be trained and go through a breaking-in period with higher error rates. Actual costs therefore may be higher, but local officials facing the public are more concerned with the budget which determines local taxes.
Brizius also explained that the black migration to the northeast area peaked about 1965. Census data confirms this. Based on his studies and experience, the average family going on welfare remains there for about 2 1/2 years. New migrants do not generally go on welfare until about six years after arrival. The typical pattern is that the family makes an effort to stay together; then it encounters the problem of the urban area, some are injured or lose work, and the family structure deteriorates, resulting in the need for welfare.
Brizius suggested a state-administered plan would eliminate need for staff in some areas of the State where case load does not justify it, and it would enable a computer network to be used for much of the work. Such a system would help *265 on the WIN program. It could be tied to other state agencies. The State could coordinate with federal agencies better than county units can or could.
He also explained that a state-administered plan would prevent local bias against some aspects of programs from frustrating them. In one county the local officials don't like food stamps; therefore, they subtly block the program by not informing people about that program or stalling applications.
On cross-examination Brizius conceded that if the State funded a computer system, the several counties could attain many of the advantages of a state system by using remote terminal connections to their operations.
He also agreed that the State had to choose between alternatives in the light of costs and revenues. The funds for help to abused and battered children may have to come from welfare savings. The Medicaid programs, for which State pays all matching costs, now costs about as much as all other benefits paid under the federally assisted categories of welfare. Its costs are still rising. He also stated that the Task Force on Welfare Reform had recognized that the cost of a state takeover of all costs was so great that the Legislature might have to continue to require the counties to pay part of the amount unless new revenues became available to the State.
Thomas Ritti, Director of the Division of Public Welfare in the Department of Institutions and Agencies, testified for the State. He has worked within the Division since 1950 and been Director since 1954.
Ritti agreed with the other witnesses that a state-administered plan could be as, if not more, responsive to local individuals than a county-administered plan.
He did not agree that the present system was as rigid as the others testified. He gave illustrations of how he and his staff are available on all problems to the counties โ for example, the existence of a committee of county directors to work with his office and try to solve problems before they arise.
*266 He stated that he could not express any opinion on the question of whether a state plan would be better than the present plan without knowing what conditions the Legislature would impose. If there is inadequate staff, equipment, etc., it would be worse. If adequate, it could be better. He conceded that at the request of a Commissioner he had drafted legislation for a state plan which would be good, but the proposal was never sent to the Legislature.
Ritti testified that as long as the counties administer the plan it is essential that they have a "fiscal stake." In his words, "It is just plain common sense." He was afraid costs would soar unless local officials had to provide some of the costs of benefits.
The court finds that the reasons for the "fiscal stake" are to encourage efficiency and to keep the amount of the state revenues allocated to payment for welfare balance with its revenues.
The court finds that the proofs concerning efficiency of state administration versus county administration do not show that the Legislature's decision was arbitrary and capricious. The State has tried both systems. Approximately 26 states operate systems similar to the State's present system. Both the testimony of Ritti and reported decisions show this. According to Ritti, the experience of other states does not show that one system is necessarily better than the other. The Legislature has had the benefit of two separate studies. Its action in changing the system over the years to meet different problems shows that it has not ignored the problem.
The court finds no support in this record for finding the respective state plans violated the Federal regulations on local fiscal participation. Since those plans have been the means by which the State has received hundreds of millions of dollars for disbursement to the counties, there is at least an inference that the federal officials have found no such violation.

*267 (c) Does State's determination to adopt the programs make the programs state functions which cannot be delegated?
Plaintiffs urge that the reasons for the need for assistance are now not just those recognized in simpler times. They are associated with industrial development and economic activity over which local communities have no control. Technological change can cause thousands to lose their jobs. Fiscal policies of the Federal Government, large business corporations and/or foreign governments cause economic activity to expand or contract, with effects in local communities which such communities cannot control.
The rights of citizens and others to travel freely within the United States of America in search of greater opportunity, with the assurance that local communities cannot deny them benefits afforded others, has, and does, at times create tremendous burdens on local communities for the costs of welfare.
When the prevailing viewpoint was that a member of a community needed help either due to tragedy, or moral weakness, it may have been appropriate to tell charity and the communities to do the job of rehabilitation or bear the burden. But the considerations mentioned above demonstrate that the latter ground is no longer the basis for the social programs that exist.
The testimony of Sternlieb and Brizius, as well as the data from the Census Bureau, show that there is support for these views. See Report of the National Advisory Commission on Civil Disorders, "The Migration of Negroes from the South," at 239 (1968). The record establishes the impact on Newark and the county.
The response of the Congress and the Legislature in adopting the programs, the cost of which are at issue here, shows recognition of these factors.
Recent events in the finance of the City of New York have again reminded many that the municipalities are *268 created by the independent sovereign states and that the federal power to deal directly with them is limited. See Ashton v. Cameron Cty. Water Improv. Dist. No. 1, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309 (1936) (Bankruptcy Act not applicable to local units of government, on grounds that the Federal Government lacks power to interfere with the state); but see, United States v. Bekins, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137 (1938) (utilization of Bankruptcy Law, as amended by local unit of government with consent of the state, held valid).
In recognition of this, and also to simplify the federal administrative problem, Congress limited the opportunities to participate to the several states. The fact that the State acted responsibly by exercising its option to help its needy people in a humane manner pursuant to its sovereign power did not destroy that sovereign power in respect to the counties.
The federal regulations referred to above recognize, and the courts have sustained, a state requiring local fiscal participation. State v. County Court of Malheur County, supra; Lindsay v. Wyman, supra.
The State's choice is not between doing nothing or doing it all, Dandridge v. Williams, supra, 397 U.S. at 486-487, 90 S.Ct. at 1162, 25 L.Ed.2d at 502-503, but to act rationally in respect to its efforts. The State's use of existing divisions of government and existing tax structures to a limited degree, is not irrational action.
In Robinson v. Cahill, supra, the Supreme Court held that the State could require the local municipalities to defray the cost of education from local resources but that such action would not relieve the Legislature from seeing that what was provided met the constitutional guarantee.
The court concludes that the State's exercise of the options offered it by Congress did not, and does not, compel the State to bear all costs, but that the Legislature may call upon the counties to meet part of the costs of welfare.
*269 The court concludes that under the present system the State's plan reflects an attempt to centralize work at appropriate levels, to distribute the burden of raising revenue to meet costs within available resources, and to call upon the local units of government to meet a part of that burden to an extent that it has not produced inadequate payments.
The court concludes that the present system is reasonably based on a plan intended to make help available within available resources and does not violate the concepts of equal protection of the law in the Fourteenth Amendment or State Constitution.

IV

Does the Present System of Distributing the Cost Burden for the Functions in Question Violate the Implicit Premise of Local Government?
Plaintiffs' challenge to the State's mandating the respective counties to pay the cost at issue is based upon the following statements by Chief Justice Weintraub, writing for a unanimous Supreme Court in Robinson, supra:
Nor do we consider a question the parties have not projected, whether, apart from the equal protection guarantee, there is an implicit premise in the concept of local government that the State may not distribute its fiscal responsibility through that vehicle if substantial inequality will result. It may well be that at one time there was a rough correlation between the needs of an area and the local resources to meet them so that there was no conspicuous unfairness in assigning State obligations to the local units of government. Surely that is not true today in our State. Problems are now mobile. They have settled intensively in limited areas. Statewide there is no correlation between the local tax base and the number of pupils to be educated, or the number of the poor to be housed and clothed and fed, or the incidence of crime and juvenile delinquency, or the cost of police or fire protection, or the demands of the judicial process. Problems which are in no sense local in origin have become the special burden of those who cannot find a haven elsewhere.
We need hardly suggest the convulsive implications if home rule is vulnerable upon either of the grounds to which we have referred. *270 Nor need we expound the difficulties of management of judicial solutions if the problem must be met by the courts. [62 N.J. at 500-501]
Prior to trial plaintiffs framed this issue in the following language appearing in the pretrial order:
Whether the County as a unit of local government in which plaintiffs reside has been unfairly and inequitably burdened by a distribution by the State of the State's fiscal responsibility in such a manner as to result in substantial inequality in derogation of the intention and purpose of the State's constitutional concept of local government.
In the evidence presented at trial and in briefs plaintiffs presented two reasons why the present system is invalid. First, these costs must be considered in isolation from revenues that the federal and state governments have made available to local units of government for carrying out other activities of general purpose local governments. So considered, the costs in question are the basis of an inequitable distribution of the tax burden needed to defray them. Second, the locally elected officials have no discretion in determining what amounts shall be spent in these areas and therefore must cut expenditures in other areas to keep taxes within reason, thereby violating the implicit premise of local government because there is no local fiscal control.
The State contends that the statutes are presumptively valid. It further contends that the question whether the State's allocation of these burdens in the present system is inequitable must be evaluated in the light of the aid given to the areas that have the alleged greatest burden; hence, the analysis must be made at the municipal level and not the county level.
At trial plaintiffs objected to the introduction of any evidence as to revenues from the federal and state government for general local purpose government on the grounds of irrelevancy. The court admitted the evidence as being relevant to a determination of whether the State has acted arbitrarily, *271 capriciously, discriminatorily or unfairly in the distribution of burdens. See Evid. R. 2.
The court will consider the contentions in the order stated, but first it is necessary to understand what local government is within the "State's constitutional concept of local government" and the context within which Chief Justice Weintraub made the quoted statements.

A. Relation of Local Government to the State.
The relation of local government to the State was carefully reviewed in Attorney-General v. McGuinness, 78 N.J.L. 346 (E. & A. 1910). The Court of Errors and Appeals held that the Legislature had the power to provide that the Civil Service Act would apply in any unit of local government which adopted it and that the statute could be administered by commissioners appointed by the Governor even though the effect of said statute provided for governing certain aspects of municipal action by commission and not elected officials. It pointed out that there was no right to home rule under the 1844 Constitution. It said:
* * * As pointed out by Justice Van Syckel in Fritts v. Kuhl, 204 (51 N.J. Law 191, 204), "It is a postulate of a state Constitution, which distinguishes it from the federal Constitution, that all the power of the people is delegated by it except such parts of it as are specifically reserved."
It is the very essence of government that it shall operate upon those who are unwilling to be governed. The right of local self-government, if it exists, necessarily limits to that extent the powers of the general government; it creates in some sense and to some extent, an imperium in imperio. Such a limitation is not to be implied.

* * * * * * * *
Our municipalities are not imperia in imperio; they are but agencies of the state erected in and for limited parts of its territory, whose governments are established by the state for limited purposes that are of particular concern to the immediate inhabitants, but at the same time are of concern to the people at large. [at 354]
*272 The United States Supreme Court has recognized this view. Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, 62 S.Ct. 1129, 86 L.Ed. 1629 (1942), aff'g 127 N.J.L. 239 (E. & A. 1941). In that case plaintiffs challenged the validity of New Jersey statutes which regulated the administration of fiscal affairs of a local unit of government that had encountered financial difficulties and provided a means of paying its debts, on the grounds that the state statutes were in conflict with the bankruptcy power of Congress and impaired contract rights. Justice Frankfurter, writing for an unanimous Supreme Court, upheld the validity of the statutes and said:
The principal asset of a municipality is its taxing power and that, unlike an asset of a private corporation, can not be available for distribution. * * * The notion that a city has unlimited taxing power is, of course, an illusion. A city cannot be taken over and operated for the benefit of its creditors, nor can its creditors take over the taxing power. Indeed, so far as the federal Constitution is concerned, the taxing power of a municipality is not even within its own control โ it is wholly subordinate to the unrestrained power of the state over political subdivisions of its own creation. A municipal corporation * * * is a representative not only of the State, but is a portion of its governmental power. * * * The State may withdraw these local powers of government at pleasure, and may, through its legislature or other appointed channels, govern the local territory as it governs the State at large. It may enlarge or contract its powers or destroy its existence. United States v. Baltimore & O.R. Co. 17 Wall (84 U.S.) 322, 329, 21 L.Ed. 597, 600 * * * [316 U.S. at 509, 62 S.Ct. at 1133, 86 L.Ed. at 1635]
During the Constitutional Convention of 1947 sincere and concerted efforts were made to persuade the delegates to adopt a provision in the proposed Constitution to place some limits on the power of the State in respect to mandating costs of local units of government and to afford greater freedom of action to the people of a community in choosing the form of local government by which local affairs would be governed. These efforts were unsuccessful for the most part. See Statement of John F. Evans, 3 Proceedings of the Constitutional *273 Convention of 1947, "Committee on the Legislative", at 706, as to effect of failure to provide for home rule.
In 1 McQuillin, Municipal Corporations (rev. vol. 1971), ง 1.37 at 44, the author states:
* * * Nevertheless, in most states it is firmly held that, in the absence of special constitutional provisions, there is no inherent right of local self-government which is beyond legislative control.
In respect to the choice of form of local government, the Constitutional Convention recommended that the Legislature provide by statute for a series of optional forms of local government. In 1950 the Legislature did adopt the Faulkner Act permitting the electorate of a local political subdivision to choose among a given set of charters, or to write their own charter subject to approval of the Legislature. L. 1950, c. 210, codified in N.J.S.A. 40:69A-1 et seq.
In terms of public policy this reflects some recognition that the electorate should be able to control local affairs subject to state-prescribed standard rules by general law pertaining to budgets, incurring of debt and other matters. The provisions in the State Constitution, adopted in 1875 and re-adopted in the 1947 Constitution, against the Legislature regulating the internal affairs of municipalities by special laws, N.J. Const. (1947), Art. IV, ง VII, pars. 9, 10 and 11, reflect the ongoing desire and battle for local control of local affairs.
The reference in Robinson v. Cahill, supra, 62 N.J. at 500 to "an implicit premise in the concept of local government that the State may not distribute its fiscal responsibility through that vehicle if substantial inequality will result," was not a reference to an articulated constitutional guarantee but rather was an undefined concept of fairness and equality to be developed in the future.
So long as the State has decided in the exercise of its constitutional power that there shall be local units of government, then, as suggested by Justice Frankfurter in Faitoute Iron & Steel Co. v. City of Asbury Park, supra, *274 such units of government must have enough taxing power to carry on their essential functions or they cannot operate.
The basic thought is that the courts cannot compel local officials, any more than private parties, to do the impossible. This is recognized in other well established legal concepts. Equity will not order the doing of an impossible act. See 30 C.J.S. Equity ง 16 at 803; Fiedler, Inc., v. Coast Finance Co., Inc., 129 N.J. Eq. 161, 168-169 (E. & A. 1941).
The law courts will not allow damages for an alleged breach of contract where the conditions under which parties struck their bargain have been drastically changed by events beyond their control, and hence performance by the party to be charged is excused if the purpose of their agreement has been frustrated. See 3 Williston, Sales, ง 661c at 534 (1948); 6 Corbin, Contracts ง 1353 et seq. (1962); La Cumbre Golf and Country Club v. Santa Barbara Hotel Co., 205 Cal. 422, 271 P. 476 (Sup. Ct. 1928).
That our Supreme Court was concerned about the ability of the local units to carry their burdens is evident from other passages in Robinson, supra:
* * * A system of instruction in any district of the State which is not thorough and efficient falls short of the constitutional command. Whatever the reason for the violation, the obligation is the State's to rectify it. If local government fails, the State government must compel it to act, and if the local government cannot carry the burden, the State must itself meet its continuing obligation. [62 N.J. at 513; emphasis supplied]

* * * * * * * *
Upon the record before us, it may be doubted that the thorough and efficient system of schools required by the 1875 amendment can realistically be met by reliance upon local taxation. The discordant correlations between the educational needs of the school districts and their respective tax bases suggest any such effort would likely fail, and this wholly apart from the issues we left unresolved in Point I. * * * Nor do we say that if the State assumes the cost of providing the constitutionally mandated education, it may not authorize local government to go further and to tax to that further end, provided that such authorization does not become a device for diluting the State's mandated responsibility. [at 520]
*275 If the State should ever distribute its fiscal burdens in such a manner that the realized revenues of municipalities had to be paid entirely to the schools, N.J.S.A. 54:4-75, and/or to the counties in which they were located, or to the State for county or state purposes, as required under N.J.S.A. 54:4-74 (which payment must be made even if tax revenues are not adequate, by borrowing the funds to pay the obligation, N.J.S.A. 54:4-76), leaving no funds for municipal purposes, few would urge that such a system was fair and equitable, for it would deny to citizens the local government which the State has either heretofore granted them or allowed them to form under the Faulkner Act or other laws. Even short of such an extreme position many would urge that a state system that left the municipalities with a level of revenue only sufficient to meet debt service and provide token performance of essential services would be substantially inequitable, for it would deny what the State had promised.
In examining the phrase, "there is an implicit premise in the concept of local government that the State may not distribute its fiscal responsibility through that vehicle if substantial inequality will result," taken from Robinson, supra at 500, this court construes the "implicit premise of local government" to refer to the implied obligation of the State, so long as it permits local government to exist, to be fair in the distribution of its burdens. But that does not mean that it results in a denial of the existence of the constitutional power of the State to delegate functions or require local contributions to bear part of the costs of services rendered in the local community.
There are and always will be different aggregates of land improvements and other forms of wealth which may be subjected to tax in the different geographic areas or political boundaries of the local units of government. The citizens of the different communities will need and/or want different services. So long as there is local government and real property taxation, there will be differences in tax rates.
*276 This court construes the reference to "substantial inequality" in the phrase quoted above to mean that State is to distribute its responsibility in such a manner that a local unit of government charged with the duty of rendering service will have the capability of rendering the service on a basis comparable to that delivered in other areas. A similar thought is found in the laws and regulations pertaining to a state requiring local financial participation under Medicaid, to the effect that funds are to be apportioned in such a manner that any lack of funds from a local source will not affect the amount or quality of care.
This court construes the reference to "conspicuous unfairness" in Robinson, supra at 500, to mean that there may be reasonable differences in burdens between areas โ mathematical precision is not required โ provided that there are reasonable resources left to meet other needs.
An effect of the implicit premise will be the tendency to equalize tax rates, but equal tax rates for the same service in all units of local government is not the end to be compelled by the implicit premise. The latter result might have the same draconian effect upon the continual existence of local units of government as a rigid application of the concepts of equal protection of the law.

(B) Present system of distributing burdens and state aid.
The New Jersey Tax Policy Committee studied the revenues of the State and local governments in 1971 and the expenditures for the State Government, including many of the functions at issue herein, and certain municipal functions. Its report is set forth in five volumes. It is part of the stipulated evidence.
In volume 3 of that study the suggestion is made that a means for solving some of the broader problems reflected by the evidence herein is a system of block grants from the State to local units of government. The effect of such a *277 system is explored, based on one set of assumptions, in a study done by one of the state agencies of the cost of a state program for municipal block grants and the assumption of certain of the costs at issue herein. There has been much written about such programs. See 1 McQuillin, Municipal Corporations (rev. vol. 1971), ง 1.66 et seq., at 96 et seq., for summary comment; Netzer and Heilbrun, authors mentioned supra, and other authors referred to in exhibits, refer to such systems. The use of grants to local units of government is a recognized means of ameliorating, but not totally solving, some of the inequities arising from the distribution of problems and unequal tax bases. See McQuillin, op. cit.
The focus of the evidence in this case was on Newark. As earlier noted, Rother testified that the net mandated costs allocated to Newark aggregated about $8,518,365.
Plaintiffs called Dr. George Sternlieb. He has an impressive academic background. He is Director of the Center for Urban Policy Research at Rutgers University and Professor of Urban Regional Planning at that University. He has conducted two studies on housing conditions in Newark and the related problems of the tax rate. The findings have been published in book form. They are Sternlieb, The Tenement Landlord (1969) and Sternlieb and Burchell, Residential Abandonment (1973). These were also part of the stipulated evidence.
He explained that if the older cities of the north, midwest and California had not existed when the immigration from the south and the Hispanic-speaking countries occurred in the 1950s and 1960s, the nation would have had to create a substitute for them with similar characteristics: housing with low cost, public transportation and jobs for those who had few skills. The high cost of housing, the high cost of car ownership and the lack of jobs in outer areas made these areas inaccessible to the new groups.
Both Arnold and Sternlieb agreed that the concentration of the new groups in the area of the State's six largest cities *278 and, in recent years, in the areas surrounding them, has tended both to increase tax rates in those areas because the new groups need more services and to lower housing values because they cannot pay high rents or high prices.
Sternlieb explained that in terms of a landlord the effect was to force him to choose between maintenance or paying taxes. When taxes are deferred, Newark ultimately gets the real property on foreclosures because there is no buyer. Although there will be a loss of real property for nonpayment of real estate taxes, because there is no personal liability, the owner will take the rent roll and abandon the property in the period between the decision not to pay taxes and the loss of the property. N.J.S.A. 54:4-78 imposes personal liability for personal property taxes but not for real property taxes. In re Taylor, 30 N.J. Super. 65, 70 (Cty. Ct. 1954). This condition has appeared in epidemic form in various neighborhoods because the age of the structures and other negative influences coexist in those areas. In terms of the owner of the single-family or two-family home, the owner finds the market price reduced by the capitalized value of the difference between the high tax rate in the older areas and the lower rate in other areas; thus, when he sells he sells at a discount. A similar consideration influences the value of older commercial buildings and decisions to build new ones. The effect is an ever-decreasing tax base and escalating tax rate.
He further explained that similar conditions exist in the other five largest cities of the State, but not to the extent that they exist in Newark. In other states, where the state pays for all or many of the costs at issue, the real estate conditions are better. In Pittsburgh, Pennsylvania, which has many of the characteristics that Newark has, i.e., recent new groups, older housing, etc., the real estate tax is lower and real estate values more stable. He attributed the difference between Newark and Pittsburgh to Pennsylvania's paying many of the costs at issue.
*279 He expressed the opinion that elimination of the mandated costs would have two salutary effects. Owners of real estate would know that a sudden swelling of welfare rolls would not push local taxes up. This would help stabilize affairs. The other effect could be either a tax reduction, or a benefit of a city service to real property owners which could improve neighborhoods, such as the tearing down of burned out buildings.
The State relied primarily upon the testimony of John F. Laezza, Director of Division of Local Government Services in Department of Community Affairs. He has a master's degree in Public Administration and is a certified public accountant and a registered municipal accountant. His responsibilities include certifying all budgets for the counties and municipalities as to compliance with state budget law and assisting municipalities on financial problems.
In terms of tax burden and delivery of services he said that the local tax burden is the difference between the aggregate of payments to the county, payments to schools, and all local expenditures, less all offsetting revenues other than the real estate tax. The difference is raised by real estate taxes.
Laezza testified that in recent years Newark has collected between 87.36% and 89.5% of the taxes levied. This has two effects. By state law Newark has to operate on a cash basis. To make up the difference Newark has to increase its levy by about 12% to realize enough cash, thus driving up taxes. The other potential effect is to increase the number of foreclosures.
The tax burden for the State's municipalities is basically the real estate tax. Therefore, as long as the municipalities have offsetting revenues the amount to be raised by real estate taxes is reduced. In Laezza's opinion, even if such revenue is not directed to a specific expense, it is relevant because it reduces tax burden.
Laezza based his testimony on the 1974 Newark budget. Rother's testimony on the mandated costs was based on 1973 *280 data. From the 1974 county budget the court has determined Newark's share of county taxes to be $24,521,586. This amount has been added to Newark's municipal purpose expenditure. School elements have not been included because no one has introduced any data on that issue.
Newark then had to raise $166,247,598 for local purposes, plus $24,521,586 for all county purposes, or a total of $190,769,184. About 36.8% of the amount for county purposes is for mandated costs, or $9,023,943.
Laezza testified that Newark had $116,006,255 from sources other than the real estate tax. $34,600,000 of this amount is received as federal or State aid for specific categorical programs. Of the $116,006,255 the State also pays $42,862,559 through the following programs:

Personal property tax replacement
guarantee $16,886,990
R.R. replacement tax guarantee 1,209,538
Public utilities
 gross receipts 5,464,687
 franchises 4,077,921
Insurance 5,064,808
Sales tax distribution 1,335,021
Financial business tax 103,726
Balance miscellaneous 8,719,868
 ___________
 $42,862,559
 ===========

The total payment by the State to local units of government under these laws was $382,213,420. The aggregate to the units in the county was $54,440,612.[15]
The effect of these payments was to reduce from $190,769,184 to $74,762,929 the amounts to be raised by Newark for all county and local purposes. Of that amount $9,023,943 is the gross amount attributable to all mandated costs. As noted earlier, fees and payments by the State to *281 the county reduce the gross amount of the mandated costs somewhat. But the present system shifts more than $17 million of welfare costs from Newark to other communities in the county. These payments do not include payments by the State for costs associated with Martland Hospital which the city formerly ran at a deficit. See page 249, supra.
Laezza testified that in his opinion Newark's percentage of collection of taxes was not a catastrophic problem. The percentage is stable. Those who have rated Newark for bonding purposes have considered this. At the trial Newark had a BAA rating by one national rating organization and BBB by the other.
No court reviewing this record, particularly a court sitting in Newark, can say that even with the amounts paid by the federal and state governments, Newark is a tax haven. Newark does need aid. But the issue in this case is not to determine what is an appropriate measure for the municipal overburden of Newark (see dissenting opinion of Justice Pashman in Robinson v. Cahill, 69 N.J. 133, 155 (1975) (Robinson IV) at 169-173) and then to subtract the costs at issue from whatever the municipal overburden is.
Based on this record and this court's interpretation of the implicit premise, the issue is whether the State's action is such in respect to these costs that it has violated the implicit premise. The court finds that action by the State in recent years in assuming such burdens as Martland Hospital, giving Newark a guarantee of $15 million under the distribution formula for the tangible business personal property tax, and other laws, is a relevant factor.
Some may urge that if the court considers such revenues, then it must necessarily have to consider the whole demand for services needed in Newark, whether reflected in the budget of Newark or not. The majority in Robinson (IV), supra at 151, declined to consider municipal overburden in terms of redistributing aid, in part because of the complexity of the problem. Aside from the lack of data on this matter in the record except in the most general terms, the court concludes *282 that the relevant issue is whether the obligation of Newark to pay the $9,023,943 of mandated costs has totally, or significantly, crippled the ability of Newark to function as a local government. The court concludes that it has not.
If a statewide uniform system of real property tax were substituted, the saving to the county would be $20,806,538, or 30 tax points, and the saving to Newark would be $5,400,000.
No specific data was presented in respect to any other municipality.

(C) Unless amounts to be spent are fixed by locally elected officials, the implicit premise of local government is violated.
Plaintiffs cited Bernards Tp. v. Allen, 61 N.J.L. 228 (E. & A. 1897), and Van Cleve v. Passaic Valley Sewerage Com'rs, 71 N.J.L. 574 (E. & A. 1905), for the proposition that the State may not authorize nonelected persons to determine the amounts to be raised by local taxation. Plaintiffs urge that, particularly in respect to the categorical welfare programs, the amounts are not determined by locally elected officials or even nonelected local officials. These welfare mandated costs aggregate $79,072,780 for all counties statewide, and $21,890,982 for the county.
As pointed out in State v. County Court of Malheur County, supra, there is a difference between a state mandating that a function be performed and paid for in part by a subordinate unit of government and the state ordering the levying of a tax on the local level. In respect to the costs in question, those who have the power to tax levy the tax.
The State has the constitutional power to require units of local government to perform services and to pay for them, including the providing of relief to the needy. See East Orange v. McCorkle, supra.
*283 As the Court of Errors and Appeals noted in Attorney-General v. McGuinness, supra, 78 N.J.L. at 369, the cases cited herein by plaintiffs turned upon the delegation of the power to levy taxes to persons not part of a local institution of government and pointed out that where appropriate authority had certified that certain funds were necessary, the courts had ordered payment of such funds, citing Freeholders of Essex v. Park Comm'n, 62 N.J.L. 376 (E. & A. 1898). See also, Elizabeth Bd. of Ed. v. Elizabeth City Council, 55 N.J. 501 (1970).
If plaintiffs' argument is accepted, that all costs which influence local taxes must be set by local officials, then the State's power to delegate functions and to require that they be performed will be subject to the will of local officials. This proposition was rejected by a unanimous Supreme Court in Robinson, supra. The court concludes that plaintiffs failed to establish that the distribution of the mandated costs reflected in this record is inconsistent with the State's obligations under the implicit premise of local government.

V

Rulings on Evidence
At trial the State offered data based on disposable personal income in the various communities in the State to show the effects of the distribution of the tax burden. This data used, as a starting point, data from a commercially published magazine which gathers information from various governmental agencies at the federal and state level. It keys this data to the decennial census data. By means of indices, the computation of which are secret, it trends the census data.
Plaintiffs objected at trial to its use on the ground it was based on expert opinion because of the indices, and that the expert was not available for cross-examination. Plaintiffs further contended that the State's data had to be corrected to allow for rooming houses, seasonal homes, income *284 earned in other areas, etc. The State urged that the data was widely accepted and used as reliable by governmental agencies, economists and business, and therefore was sufficiently reliable and trustworthy. The court took the proof in the nature of an offer of proof so that it would be available for an appellate court to examine. This court concludes that plaintiffs' grounds of objection were correct and has not considered the challenged data, 3 Wigmore, Evidence (Chadbourn rev. 1974), ง 791; 5 Wigmore at ง 1385a; Townsend v. Radcliffe, 63 Ill. 9, 15 (Sup. Ct. 1872) (report of survey commissioners appointed under statute could only be received in evidence in connection with testimony of a commissioner as witness), except so much thereof as established what dollar amounts of real estate tax were paid by what classes of real property. The latter data was taken from records kept in management and operation of the State's business. Evid. R. 63 (13).
Plaintiffs also urged that in respect to statements made in memoranda by officials in the Executive and judicial branches to the Legislature on pending or proposed legislation, that such statements, if contrary to State's position here, were in many cases admissions against interest and therefore the State was bound by them. The court rejected this contention. The power of the Legislature to determine policy for the State cannot be abrogated by the action or words of a subordinate official. See 31A C.J.S. Evidence ง 359 at 867; Central R.R. Co. of N.J. v. State Tax Dept., 112 N.J.L. 5, 13 (E. & A. 1933) (railroad not allowed to utilize excerpts from reports by legislative commissions on the question of undervaluation of realty, for such public officers do not have authority to bind principals except where such authority plainly conferred); De Arnaud v. United States, 151 U.S. 483, 14 S.Ct. 374, 38 L.Ed. 244 (1894); Finn v. United States, 123 U.S. 227, 8 S.Ct. 82, 31 L.Ed. 128 (1887) (in absence of authority expressly or impliedly conferred on him for that purpose, government official cannot waive statute of limitations defense).
*285 The use of such material to cross-examine a witness who testifies to a contrary view was allowed on the grounds that it is a prior inconsistent statement.

CONCLUSION
For the reasons stated above, judgment is entered for defendants. No costs allowed.

ADDENDUM
During the period that the foregoing decision was being typed in final form, the New Jersey Supreme Court handed down Robinson v. Cahill, 69 N.J. 449 dated January 30, 1976. (Robinson V).
This court has reviewed that decision and determined that the decision in this matter should not be changed because of Robinson V.
Robinson V highlights once again a basic difference between the issues in that case and this one. In this case there is no allegation or proof that any one is being denied any benefit or service that he, she or it is entitled to. In Robinson I to V there is proof regarding denial of a right to a thorough and efficient education for which a standard has now been set. The remaining question is whether the action of the Legislature plus local resources will enable all units of local government to meet that standard, i.e., the capability to perform.
In the simplest of terms, the issue here has been whether the distribution of the burden to pay for benefits and services, the adequacy of which are not challenged, is unconstitutional.
All courts have exhibited concern with the host of problems centered in the urban cities and adjoining areas as well as the isolated areas of poverty in rural regions.
This decision has made but passing reference to the laws and decisions that have dealt with them on a continuing basis to find solutions. The recent decision of Judge Blumenfeld in *286 City of Hartford v. Hills, Civ. No. H-75-258 (D. Conn. 1976), wherein the court held Hartford had standing, within the meaning of Warth v. Seldin, supra, to enjoin payment of funds to communities adjoining it which did not address themselves to the needs of low-income and moderate-income families, because under the terms of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633, 42 U.S.C.A. ง 5301, et seq., monies not paid out had to be reallocated within the same metropolitan area. The said act was studied and debated for four years. It is a consolidation of ten separate categorical programs into one, with what is hoped to be a simpler administrative system.
The provisions of said act as construed and applied in the Hartford case should have an impact on the problems that cause municipal overburden if the provisions continue in effect for a period of time.
The further refinement of the methodology employed to determine municipal overburden, as well as further explication of what are appropriate factors to take into consideration in measuring the amount of it, e.g., the exhibits in the record, neither consider the presence of exempt real property attributable to buildings or land owned by federal, state or county government but include public housing, nor assistance received under the State and Local Fiscal Assistance Act of 1972, Pub. L. No. 92-512, 86 Stat. 919, 31 U.S.C.A. งง 1221-1228 (general revenue sharing), may provide a useful tool for measuring what a local unit of government can perform.
In the context of need for change and action, the courts must be careful not to apply the concepts of the Equal Protection Clause like a vise, as Judge Friendly cautioned in Aguayo v. Richardson, 473 F.2d 1090, 1109-1110 (2 Cir.1973), cert. den. sub. nom. Aguayo v. Weinberger, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974), lest needed experiment by different treatment of small groups be stymied, *287 as was the issue in that case, or means to put adequate resources in poorer districts be stopped. Seehawer v. Schmidt, 363 F. Supp. 635 (E.D. Wis.), aff'd 414 U.S. 1105, 94 S.Ct. 832, 38 L.Ed.2d 734 (1973).

APPENDIX

TABLE A

COSTS PER $1,000 EQUALIZED VALUATION JUDICIARY-ADMINISTRATION

 Expended Budgeted
 County 1973 1974
 Essex 1.76 2.07
 Hudson 1.48 1.66
 Camden 1.09 1.41
 Passaic 1.02 1.40
 Cumberland 1.11 1.34
 Atlantic .70 1.20
 Union .98 1.16
 Salem .97 1.10
 Mercer .97 1.00
 Gloucester .67 .94
 Morris .69 .87
 Burlington .57 .72
 Somerset .71 .71
 Middlesex .72 .69
 Warren .56 .68
 Monmouth .51 .60
 Sussex .38 .59
 Ocean .79 .57
 Bergen .48 .55
 Cape May .40 .52
 Hunterdon .35 .47

*288 TABLE B

COSTS PER $1,000 EQUALIZED VALUATION WELFARE

 County 1973 1974
 Essex 2.86 2.97
 Camden 2.38 2.44
 Cumberland 2.16 2.20
 Hudson 1.90 2.05
 Atlantic 1.89 2.01
 Salem 1.46 1.39
 Monmouth 1.19 1.28
 Mercer 1.07 1.27
 Passaic 1.08 1.18
 Gloucester .68 .86
 Burlington .67 .75
 Middlesex .59 .67
 Warren .45 .59
 Sussex .50 .55
 Ocean .50 .55
 Union .49 .54
 Cape May .46 .42
 Somerset .29 .40
 Hunterdon .31 .34
 Morris .17 .20
 Bergen .18 .19

*289 TABLE C

U.S. CENSUS DATA โ 1970 POPULATION CHARACTERISTICS VALUATION

 BLACK RESIDENTS POOR RESIDENTS
 AS % OF COUNTY AS % OF COUNTY
 COUNTY POPULATION COUNTY POPULATION
 Essex 30.00 Essex 13.1
 Atlantic 17.33 Atlantic 13.0
 Mercer 16.43 Cape May 12.4
 Salem 15.30 Hudson 11.9
 Cumberland 13.64 Salem 11.9
 Camden 11.34 Cumberland 11.8
 Union 11.19 Passaic 9.3
 Passaic 18.45 Mercer 9.3
 Hudson 10.07 Camden 8.9
 Burlington 8.71 Ocean 8.5
 Gloucester 8.34 Gloucester 7.8
 Monmouth 8.28 Monmouth 7.7
 Cape May 7.89 Warren 7.0
 Middlesex 4.41 Sussex 6.8
 Somerset 3.57 Hunterdon 6.3
 Ocean 3.03 Burlington 6.3
 Bergen 2.78 Union 6.1
 Morris 2.19 Middlesex 5.3
 Hunterdon 1.75 Somerset 4.3
 Warren 1.00- Bergen 4.1
 Sussex .50- Morris 3.8

*290 
NOTES
[1] The court held plaintiff school children were denied the right to a thorough and efficient education guaranteed under the State Constitution, and plaintiff school children and plaintiff taxpayers were denied equal protection of the law guaranteed by Fourteenth Amendment to the Constitution (14th Amendment) and State Constitution.
[2] The Supreme Court affirmed the trial judge's holding as to right of plaintiff school children to a thorough and efficient education guaranteed under the State Constitution but reversed his holding as to plaintiff school childrens' and the taxpayers' rights under the concepts of equal protection of the law and held that the State did not have to use a uniform tax throughout the State to finance costs of education. It said that it left open the question of whether, apart from the concept of equal protection of the law, "there is an implicit premise in the concept of local government that the State may not distribute its fiscal responsibility through that vehicle if substantial inequality * * * results." 62 N.J. at 500.
[3] See Bureau of Census, General and Social Economic Characteristics, New Jersey, Appendix B at 29 (1970), for definition. For a family of four, the poverty level income was about $3,743 in March 1970.
[4] Pursuant to R. 4:32-1 an order was entered on January 12, 1973 establishing the seven separate classes and designating the action as a class action. Subsequently an order was entered permitting the League of Women Voters to intervene (intervenor) although it is not clear that any member of League established that such member had rights comparable to those of any of the members of the seven classes. All seeking relief shall be collectively referred to as plaintiffs.
[5] Spelling of "Bonnett" as it appears in 126 N.J. Super. 239.
[6] Vol. 1, The Commission to Investigate County and Municipal Taxation and Expenditure Report No. 3, at 16-17 (1931).
(b) County and Municipal Government Study Commission, Second Report, "County Government Challenge and Change," at 27-28 (1969).
(c) New Jersey Tax Policy Committee, Report No. 3, at 12 (1971).
[7] L. 1974, c. 91, ง 5, effective September 10, 1974, shortened the period to six months.
[8] After a substantial portion of this opinion was completed, the court asked for some of the data used to prepare the exhibits which had been stipulated. The court finds that there are errors (as indicated infra) in the calculated tax rates per $1,000 of equalized valuation. The court finds the errors are of a nature that do not change the relative pattern shown.
[*] Costs include the following items:

1. Superior Court, Law Div. and general county courts
2. County District Courts
3. Juvenile and Domestic Relations Court
4. Prosecutor's office
5. Jury Commission and fees
6. Probation Department
7. County Sheriff โ judicial function
8. County Clerk โ Judicial function
[**] Order of rank in 1974 from among counties highest to lowest, based on budget.
[***] Costs include the following items:

1. Administration of welfare
2. Old age assistance
3. Disability assistance
4. Aid to families with dependent children
5. Aid to the blind
6. Aid to the working poor
7. Supplemental security income
8. Bureau of Children Services
[****] Based on data in United States Census for 1970.
[*****] Rank order among counties in terms of highest to lowest.
[9] For those desiring to pursue the subject of correlation, Benson gave the following references: Kendall and Stewart, Advanced Theory of Statistics (1969); Snedecor and Cochran, Statistical Methods (1967).
[*] Based on several exhibits prepared under the supervision of Dr. Purcell Benson of the School of Business of Rutgers University and testimony he gave concerning said exhibits.
[10] The $3,322,162 was derived by multiplying the percentage of all county tax paid by Newark times the total mandated costs paid by the county, (24.53%) ($32,912,066) or $8,518,365 and then multiplying this figure times that percentage of Newark's tax obligation which is met by residential property, ($8,518,365) (39%) or $3,322,162.
[11] There is no allegation of proof that real property owned by blacks and the poor is assessed at a higher percentage of true market value than real property owned by others. See Weissinger v. Boswell, 330 F. Supp. 615 (M.D. Ala. 1971).

There is a case pending to compel reassessment in Newark. Essex Cty. Bd. of Tax. v. Newark, Docket L.-21672-73.
[12] Without the underlying data for all counties the court cannot tell from the summaries of massive underlying data to what extent any other errors may exist. The court recognizes that due to changes in reporting procedures in 1973 there may be some but assumes the State checked for these.
[13] Plaintiffs have subtracted these revenue items in calculating the net mandated costs for the county. The aggregate of such costs was $34,726,316 and the net was $32,912,066.
[15] Source. Ex. D-5 at trial and, the 1974 annual report of the Division of Taxation.